**AMERISURE INSURANCE COMPANY,**
and Michigan Mutual Insurance
Company, Plaintiffs,

v.

**LASERAGE TECHNOLOGY CORPORA-**
**TION, Cirqon Technologies Corporation,**
**Arthur O. Capp, Jr., Stephen L. Capp,**
**Kalman Zsamboky and Zecal Incorpo-**
**rated, Defendants.**

No. 96–CV–6313.

United States District Court,
W.D. New York.

March 10, 1998.

Reynolds E. Hahn, Petrone & Petrone, P.C., Rochester, NY, Shaun McParland Baldwin, Dawn Midkiff, Daniel R. Formeller, Andrea J. McIntyre, D.J. Dartorio, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Plaintiffs.

Joseph B. Rizzo, Gallo & Iacovangelo, Rochester, NY, Robert I. Schwimmer, Richard R. Winter, Sarah E. Pace, McBride, Baker & Coles, Chicago, IL, for Defendants Laserage Technology Corp., Cirqon Technologies Corp., Arthur O. Capp, Jr., Stephen L. Capp.

.Samuel G. Brundage, Johnson, Mullan, Brundage & Keigher, Rochester, NY, Howard G. Sloane, Jonathan D. Thier, Cahill, Gordon & Reindel, New York, NY, for Defendants Kalman Zsamboky, Zecal Inc.

## DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action involving the interpretation of two commercial general liability insurance policies. The plaintiffs seek a declaration that they are not obligated to provide a defense to the defendants, who were sued in an underlying case previously filed in this Court entitled *Kalman Zsamboky and Zecal, Inc. v. Laserage Technology, Corp., Cirqon Technologies Corp., Arthur O. Capp, Jr. and Stephen L. Capp* (95–CV–6332). The following motions are before the Court:

1. Motion [72–1] by the plaintiff Amerisure for summary judgment against Laserage and Cirqon;

2. Motion [69–1] by the plaintiff Amerisure for summary judgment against Arthur O. Capp, Jr. and Stephen L. Capp;

3. Motion [68–1] by the plaintiff Michigan Mutual for summary judgment against Laserage, Cirqon, Arthur O. Capp, Jr. and Stephen L. Capp;

4. Motion by Amerisure to bifurcate [71–1] and/or stay the counterclaim [71–2] or, in the alternative, for summary judgment as to those claims [71–3];

5. Motion [93] by Amerisure to strike references to certain extrinsic materials;

6. Motion [110] by Laserage, Cirqon, Arthur Capp and Stephen Capp for default judgment on their counterclaim;

7. Motion [112] by Amerisure and Michigan Mutual for leave to file their answer to defendants' counterclaim, instanter, to conform with the evidence; and

8. Motion [126] by Laserage, Cirqon, Arthur Capp and Stephen Capp for reconsideration of this Court's Order [124–1], denying these defendants' motion for leave to supplement their summary judgment briefs.

Oral argument on motions 1–5 above was heard on February 5, 1998.

The Court has reviewed the papers submitted in support of and in opposition to the applications, and has considered the oral arguments of Shaun McFarland Baldwin, Esq. on behalf of Amerisure and Michigan Mutual and Richard Winter, Esq. on behalf of Laserage, Cirqon, Arthur Capp and Stephen Capp ("the Laserage Defendants"). For the reasons stated below, the application to strike references to certain extrinsic materials and the applications for summary judgment are granted, the applications for default judgment on the counterclaim and for reconsideration are denied, and the remaining applications are dismissed as moot.

STATEMENT OF FACTS

Laserage is a corporation engaged in the laser machining of various materials. Cirqon is a corporation engaged in the fabrication of copper metallized circuit boards. Laserage is a majority shareholder of Cirqon. Together they have over one hundred employees and post combined sales of over $10 million.

The plaintiffs issued commercial general liability policies to Laserage, Cirqon and the Capps for the period of November 15, 1994 through November 15, 1995. The Amerisure policy provides primary coverage, while the Michigan Mutual policy provides excess coverage. Both policies provide coverage for personal injury, "caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you," and for advertising injury, "caused by an offense committed in the course of advertising your goods, products or services." Both personal injury and advertising injury are defined in relevant part as "injury ... arising out of ... oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Each policy also contains an exclusion for personal injury and advertising injury "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."

Additionally, both policies contain a provision requiring the insured to give the insurer notice of an occurrence, claim or suit. The Amerisure policy section entitled "Duties In The Event Of Occurrence, Offense, Claim or Suit" states in relevant part:

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.

\* \* \* \* \* \*

b. If a claim is made or "suit" is brought against any insured, you must: (1) Immediately record the specifics of the claim or "suit" and the date received; and (2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must: (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

\* \* \* \* \* \*

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

The Amerisure policy also contains a provision entitled "Legal Action Against Us," that states in relevant part:

No person or organization has a right under this Coverage Part: ... (b) To sue us on this Coverage Part unless all of its terms have been fully complied with.

The Michigan Mutual policy contains essentially identical provisions. The Amerisure policy has a personal and advertising injury limit of $1 million and a general aggregate limit of $2 million. The Michigan Mutual policy has a combined and aggregate limit of $5 million. The defendants also had insurance policies with at least three other insurance companies, Indiana Insurance Co., CNA Insurance Co. and American States Insurance Co., which policies are not at issue here.

On July 21, 1995, the defendants were sued in the aforementioned action entitled *Zsamboky, et al. v. Laserage Technology Corp. et al.* The complaint alleged causes of action for breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, breach of implied covenant of good faith and

fair dealing, unjust enrichment and constructive trust, correction of inventorship, misappropriation of trade secrets, declaratory judgment of patent invalidity, antitrust violations, equitable assignment of patents, and violation of the Lanham Act. The complaint alleged that between 1989 and 1995, the defendants misappropriated Zsamboky's technology, used it to obtain patents, then threatened to sue Zsamboky for selling his own technology. Zsamboky contended that the defendants told customers that he was infringing Laserage's and Cirqon's patents, and that these customers acted at their own risk in purchasing his products. He alleged that the defendants made certain false statements intentionally, knowingly, in bad faith and with knowledge of their falsity. Zsamboky sought damages for lost profits and $10 million dollars in punitive damages, as well as other relief.

Zsamboky served the defendants with summonses and complaints in early August of 1995. Arthur Capp, Chairman of the boards of both Laserage and Cirqon, learned of this lawsuit on or about August 2, 1995. Capp immediately notified Robert Schwimmer, general counsel for Laserage and Cirqon. Schwimmer is a partner at the Chicago law firm McBride, Baker & Coles, the same firm which represents Laserage, Cirqon and the Capps in the subject action. According to the 1997 Martindale–Hubbell Law Directory, McBride, Baker & Coles employs approximately seventy attorneys and lists insurance law as one of its areas of practice. Schwimmer determined that his firm, McBride, Baker & Coles, did not have patent litigation expertise, and therefore he and the defendants began looking for a patent litigation firm to defend the Zsamboky lawsuit.

Michael Wimmer, the current president of Cirqon, stated that while the defendants were interviewing prospective patent litigation firms, the question of whether there was insurance coverage for the lawsuit was raised and summarily dismissed. At his deposition, Wimmer recalled that Mr. Schwimmer said "No, of course not. It is patent litigation." (Wimmer, p. 184) [1]

At that time, none of the defendants examined the insurance policies at issue here or notified the plaintiffs of the lawsuit. In fact, Stephen Capp, the person responsible for notifying insurers of general liability claims against Laserage and Cirqon, (S.Capp, pp. 144–45) (A.Capp, pp. 269–70) admitted that he never read the notice provisions of the insurance policies, at issue here, until his deposition in this action on September 22, 1997. (S.Capp, pp. 415, 421) [2]

The Laserage defendants selected the law firm of Baker & McKenzie to defend the lawsuit. There were three attorneys at the Baker & McKenzie firm working on the lawsuit. Mr. Schwimmer also continued to assist the defendants in the defense of the Zsamboky lawsuit. The attorneys advised the defendants that defending the lawsuit could cost approximately $250,000 to $500,-000.

In October of 1995, Mr. Schwimmer discussed the possibility of insurance coverage for the Zsamboky lawsuit with one of his law partners, and he reviewed an article on the topic of general liability insurance coverage for patent cases. However, he did not advise the defendants to notify their insurers of the lawsuit. In early February of 1996, Mr. Schwimmer discussed the Zsamboky lawsuit with another one of his partners, Richard Winter, Esq. At oral argument, Mr. Winter stated that he reviewed the Zsamboky complaint and the insurance policies at issue, and concluded that the defendants should give notice of the action to their insurers. [3]

---

1. Page references are to deposition transcripts.

2. Arthur Capp also testified that he never read the insurance policies at issue here until the day of his deposition in this action. (A.Capp, pp. 377–78)

3. "Someone asked me a question. Bob Schwimmer came to me and said, I have a underlying case and they wanted to file a Rule 12 motion or

something. And I said to him, have you looked at the insurance question. And I looked at the complaint and I am—Am I an expert, well I have gotten ten years in the area. I work for a firm, I work for firms that represented a lot of insurance companies. You know, I am trained to look-out for that thing and those types of things. That's what triggered it. That's when the notice was given, immediately thereafter. Once you know where to look, it's not difficult once you know

By letter dated March 22, 1996, Winter notified Amerisure of the Zsamboky lawsuit and requested that Amerisure provide a defense. Amerisure states that it received this letter on March 27, 1996. In April of 1996, the defendants also notified three other of their insurers, Indiana Insurance Co., CNA Insurance Co. and American States Insurance Co., of the lawsuit and also requested that they provide a defense. The eight-month delay in giving notice to the plaintiffs was due solely to the fact that the defendants did not believe their policies provided coverage.[4]

By letter dated May 23, 1996, Amerisure informed the defendants that it would not provide coverage or a defense. The letter gave three reasons for the denial: First, the defendants breached the policy by failing to give timely notice of the lawsuit; second, the acts alleged in the complaint were excluded from coverage, because they were allegedly made intentionally, knowingly and in bad faith; and third, it was unclear whether the actions in the complaint took place within the period of coverage.

Between the time that the defendants were served with the Zsamboky complaint and the time that they notified the plaintiffs of the lawsuit, and thereafter, the defendants conducted all aspects of their legal defense. At one point, the defendants considered bringing a Fed.R.Civ.P. 11 motion against Zsamboky, which if successful, would have permitted the defendants to recover some or all of their litigation expenses. However, they decided not to make this motion. In August of 1996, Zsamboky offered to dismiss his action without prejudice and pay a modest cash payment to the defendants, but the defendants rejected this offer. In January of 1997, the defendants filed a counterclaim against Zsamboky and Zecal, Inc.

Eventually, the underlying action settled. On July 30, 1997, the defendants and Zsamboky executed a settlement agreement, which required Zsamboky to pay the defendants $2.75 million dollars. The defendants were not required to pay any money to Zsamboky or Zecal.

Amerisure and Michigan Mutual filed the instant declaratory judgment action on July 8, 1996, seeking a declaration that they have no duty to indemnify, defend or contribute to the defendants' costs incurred in the underlying action with Zsamboky. The plaintiffs allege that the Zsamboky complaint does not trigger the personal injury and/or advertising injury coverage, and that moreover, that the defendants breached the policy by failing to give notice of the lawsuit for approximately eight months.[5]

The defendants filed an Answer with affirmative defenses and a counterclaim. They counterclaimed for breach of contract, and as part of that cause of action, they allege that the insurance companies' denial of coverage was "vexatious and amounts to a bad faith denial." They contend that as of the date of the counterclaim, the breach had caused them damages in excess of $200,000, as well as attorneys' fees of approximately $1.1 million incurred in defending the Zsamboky lawsuit.

## CHOICE OF LAW

■■■■ Since this is a diversity action, the Court must examine the choice of law issue.[6]

---

where to look, it's not a difficult analysis." Transcript of Richard Winter, Esq.'s oral argument held before this Court on February 5, 1998.

**4.** Stephen Capp was the Laserage defendants' Fed.R.Civ.P. 30(b)(6) deposition witness. He testified as follows:

Q. What would have kept you from giving notice in August of 1995?
A. Here again, as I stated before, we didn't even in my wildest imagination think that this was an insurance issue.
Q. What I'm trying to determine, sir, was there anything other than that that impeded or prevented the Laserage defendants from giving notice in August of 1995?

A. I don't believe so. (S.Capp, pp. 237, 424–25).

**5.** The plaintiffs have essentially withdrawn the third reason for denying coverage given in their letter dated May 23, 1996, i.e. that the acts occurred outside of the period of coverage provided by the policy.

**6.** Laserage and Cirqon are Illinois corporations with their principal place of business in Illinois. Amerisure and Michigan Mutual are Michigan corporations with their principal places of business in Michigan. Arthur Capp and Stephen Capp are residents of Illinois. Kalman Zsamboky is a New York resident. Zecal, Inc. is a

The parties agree that Illinois law should apply. A federal court must apply the choice of law rules of the state in which it sits to determine which state's substantive law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York law requires courts to apply the law of the jurisdiction having "the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 101 (1954); *In Matter of Arbitration between Allstate and Stolarz*, 81 N.Y.2d 219, 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). In examining choice of law questions involving insurance contracts, New York courts consider the following factors: the location of the insured risk; the insured's principal place of business; the place where the policy was issued and delivered; the location of the broker or agent placing the policy; the place where the premiums were paid; and the insurer's place of business. *Olin Corp. v. Insurance Co. of North America*, 743 F.Supp. 1044,1049 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir. 1991). Since Illinois is the location of the insureds' principal places of business, and since it appears that the policies were issued and delivered in Illinois and the premiums paid in Illinois, and since the parties agree that Illinois law should apply, this Court will apply the law of Illinois.

## AMERISURE'S MOTION TO STRIKE EXTRINSIC EVIDENCE

■ The plaintiffs contend, in opposition to the summary judgment applications, that the defendants have submitted extrinsic materials in an attempt to raise a triable issue of fact. By "extrinsic materials," the plaintiffs are referring to sources other than the insurance agreements and the underlying *Zsamboky* complaint. Specifically, the plaintiffs' motion to strike is aimed at the testimony of, and documents created by, Amerisure's employees who reviewed the defendants' claim. In opposition, the defendants do not allege that the insurance agreements are ambiguous. Rather, they contend that certain Amerisure employees concluded that there was coverage, and further, that these same employees did not find that notice was late. The defendants admit that they are offering this "extrinsic material" to prove that there was coverage and that notice was not unreasonable.

■ The applicable law in the State of Illinois is well settled. In determining whether an event or occurrence is "covered" by an insurance policy, that is, it comes within the protection afforded by the policy, a court must limit its inquiry to an examination of the underlying complaint and the insurance contract itself. *Bituminous Cas. Corp. v. Fulkerson*, 212 Ill.App.3d 556, 571 N.E.2d 256, 260, 156 Ill.Dec. 669 (5 Dist. 1991). However, a Court may look beyond the underlying complaint and insurance policy if ancillary matters are raised which impact on the insurer's responsibility to actually provide the coverage afforded by the policy, e.g., the timely payment of premiums. *Id.*, 156 Ill.Dec. 669, 571 N.E.2d at 261. The question of whether the insured gave timely notice is the type of ancillary matter that might require an examination of extrinsic materials.

■ Based on these principles of law, the Court finds that the plaintiffs' motion should be granted. First, any conclusions of Amerisure's employees are not relevant to the issue of whether or not the policy in question provided coverage in the Zsamboky lawsuit. As indicated above, in addressing this issue, the Court must look only to the factual allegations contained in the underlying complaint and the terms and conditions of the insurance policy. Second, while concededly extrinsic material may be offered on the issue of proper notice, such "extrinsic material" must be evidentiary proof in admissible form, the standard required for summary judgment. Fed.R.Civ.P. 56(e). The crux of the defendants' argument is that the failure of Amerisure's employees to state that notice was untimely allows one to infer that notice was in fact timely. That is, the defendants contend that because the timeliness of notice was not specifically addressed in certain preliminary internal notes and memoranda, this creates an inference that notice was timely.

New York corporation with its principal place of business in New York.

However, this alleged inference is not supported by evidentiary proof in admissible form. Rather, the defendants are relying upon an absence of evidence. Moreover, it is clear that these notes and memoranda were concerned with the issue of whether there was coverage for advertising injury, not whether notice was timely. Consequently, the failure to specifically discuss notice in these documents does not lead to an inference which would allow one to infer that notice was timely. To obtain summary judgment, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3rd Cir. 1987) (en banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Once the moving party has met its initial obligation, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat a motion for summary judgment. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190–91 (5th Cir.1991). Obviously, inadmissible evidence cannot create a genuine issue of material fact which would defeat the plaintiffs' summary judgment motion. Accordingly, the plaintiffs' motion to strike is granted.

## SUMMARY JUDGMENT

Fed.R.Civ.P. 56 states in relevant part that the Court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." On a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998). The Court must accept as true the allegations of the non-moving party, and should draw all factual inferences in favor of the non-moving party. *Id.* at 137–38. Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The plaintiffs allege that they are entitled to summary judgment for two reasons. First, they allege that the policies do not provide coverage for personal injury or advertising injury, and that even if they do, coverage is excluded because the statements were made with knowledge of their falsity. Second, they allege that the defendants breached the insurance agreements by failing to give notice of the lawsuit as soon as practicable.

The Court denies summary judgment on the issue of coverage. The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court and appropriate subjects for disposition by summary judgment. *Crum and Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 189 Ill.Dec. 756, 620 N.E.2d 1073, 1077 (1993). To determine whether an insurer has a duty to defend its insured in an underlying lawsuit, the court must compare the complaint's allegations to the relevant coverage provisions of the insurance policy. *Id.*, 189 Ill. Dec. 756, 620 N.E.2d at 1079. "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the insured in the underlying action." *Id.* "[I]f the underlying complaint alleges several theories of recovery against the insured, the insurer will have a duty to defend even if only one such theory is within the potential coverage of the policy." *Millers Mut. Ins. Assoc. of Ill. v. Graham Oil Co.*, 282 Ill.App.3d 129, 218 Ill. Dec. 60, 668 N.E.2d 223, 228 (2 Dist.1996), *cert. den.*, 168 Ill.2d 598, 219 Ill.Dec. 567, 671 N.E.2d 734. *See also, Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178 (7th Cir. 1980) cert. den. 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495. It is the burden of the insurer to show that a claim falls within a provision that excludes coverage. *Continental Casualty Co. v. McDowell & Colantoni, Ltd.*, 282 Ill.App.3d 236, 217 Ill.Dec. 874, 668 N.E.2d 59, 62 (1 Dist.1996). An exclusion relied upon to deny coverage must be clear and free from doubt. *Id.*

In the instant case, the underlying Zsamboky complaint alleges the following: "Upon information and belief, Cirqon and Laserage, by and through their agents, have made misrepresentations to Zsamboky and to mutual or potential customers of Zecal and Zsamboky that the '315 or '947 patents were infringed and that such customers act at their own risk in purchasing products from Zecal or Zsamboky." The Court finds that this factual allegation clearly falls within the policies' definitions of personal injury and advertising injury. The policies define both personal injury and advertising injury in relevant part as "injury ... arising out of ... oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Policy terms that are unambiguous are to be given their plain, ordinary and popular meaning. *Millers Mut. Ins. Assoc. of Ill. v. Graham Oil Co.*, 282 Ill.App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223, 228 (2 Dist.1996). It seems obvious to this Court that wrongfully asserting that a competitor's product infringes patents clearly defames the competitor and disparages his product.

The plaintiffs, however, contend that a duty to defend does not arise unless the underlying complaint alleges facts which constitute the offense of commercial disparagement under Illinois law. The Court finds this argument misplaced. Plaintiffs do not cite any persuasive authority to support their contention. In fact, *Microtec Research v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 971 (9th Cir.1994), a case upon which the plaintiffs rely, is inapposite to their position. In *Microtec*, the court held that merely passing off a competitor's product as one's own did not constitute advertising injury or personal injury. The court went on to indicate, however, that it would have found advertising injury and/or personal injury if the insured had said "anything negative" about its competitor, such as alleging that it was using stolen technology. *Id.* Of course that is exactly what happened in the subject case. It seems apparent then that under the facts of the case at bar, the court in *Microtec* would have found coverage.

Moreover, the Court finds unpersuasive plaintiffs' contention that coverage is excluded because Zsamboky alleged that the defendants made certain false statements intentionally, knowingly, in bad faith and with knowledge of their falsity. Since certain paragraphs of the complaint allege that the defendants made false statements but do not allege that the defendants had knowledge of their falsity,[7] these acts would not be excluded. Likewise, Count XIV of the Zsamboky complaint, which alleges a violation of the Lanham Act, under which persons can be found liable without regard to intent, would not be excluded. *Sun Electric Corp. v. St. Paul Fire & Marine Ins. Co.*, 1995 WL 270230 (N.D.Ill. May 4, 1995); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980). Accordingly, the Court finds that the policies issued by Amerisure and Michigan Mutual do provide coverage for the acts alleged in the underlying complaint, and denies summary judgment on that basis.

The Court, however, finds that the plaintiffs are entitled to summary judgment on the issue of notice, that is, based upon the failure of the defendants to comply with the notice provisions in the Amerisure and Michigan Mutual policies. It is well settled that under Illinois law, the interpretation of an insurance policy is a question of law. *Allen v. Transamerica Insurance Co.*, 115 F.3d 1305, 1309 (7th Cir.1997). The policies at issue here required the defendants to give notice of a claim or suit "as soon as practicable." "Illinois courts have interpreted the phrase 'as soon as practicable' in notice provisions to mean that the insured must notify the insurer of an occurrence within a reasonable time, and whether the notice was given in a reasonable time generally depends on all the facts and circumstances of each case." *Casualty Indemnity Exchange v. Village of Crete*, 731 F.2d 457, 458 (7th Cir.1984). Although the timeliness of the notice given pursuant to an insurance policy provision is often a question of fact, it may be decided as a matter of law by the

---

7. See, Zsamboky complaint ¶¶ 77, 177.

court if no genuine issue of material fact exists. *International Harvester Co. v. Continental Casualty Co.,* 33 Ill.App.2d 467, 179 N.E.2d 833, 836–37 (1962). The inquiry in deciding whether the defendants complied with the notice provisions is "[w]hether [the insured], acting under the belief that the occurrence was not covered by the policy, acted as a reasonably prudent person." *Farmers Automobile Insurance Assn. v. Hamilton,* 64 Ill.2d 138, 355 N.E.2d 1, 3 (1976). "Lack of prejudice to the insurer is a factor to be considered only where the insured has a good excuse for the late notice or where the delay was relatively brief." *Twin City Fire Ins. Co. v. Old World Trading Co.,* 266 Ill.App.3d 1, 203 Ill.Dec. 264, 639 N.E.2d 584, 589 (1993); *see also Casualty Indemnity Exchange v. Village of Crete,* 731 F.2d 457, 459 (7th Cir.1984). The courts look to a number of factors in assessing the reasonableness of an insured's actions. Among these are: The language of the policy's notice requirement; the extent of the insured's sophistication in the world of commerce and insurance; awareness on the part of the insured that an "occurrence" has taken place; and once aware of an occurrence, the diligence with which the insured ascertains whether coverage is available. *River v. Commercial Life Insurance Co.,* 1997 WL 603871 at *5 (N.D.Ill., Sept.25, 1997).

▆▆▆ Applying the above principles of law, to the facts of this case, the Court concludes as a matter of law that the defendants did not act reasonably. First, the language of the policy's notice requirement is clear and unambiguous. Second, the insureds are sophisticated with regard to commerce and insurance. Laserage and Cirqon together employ over one hundred employees and post combined annual sales of over $10 million. They had purchased primary and excess commercial general liability insurance from the plaintiffs as well as from at least three other insurance companies. During the period of delay, they were represented simultaneously by two different law firms. Accordingly, it cannot reasonably be argued that the defendants are unsophisticated. Third, the defendants were clearly aware that they had been sued. Fourth, the defendants clearly failed to exercise due diligence in ascertain-

ing whether coverage was available, as evidenced by the fact that they did not even review their policies. Finally, the defendants' delay in providing notice prejudiced the plaintiffs, since it deprived them of the opportunity to meaningfully participate in the underlying Zsamboky litigation. *Casualty Indemnity Exchange v. City of Chicago,* 651 F.Supp. 467 (N.D.Ill.1985).

It has been held under Illinois law that a delay of even a few months in giving notice breaches the policy as a matter of law, defeats coverage, and justifies the entry of summary judgment for the insurance company. *Industrial Coatings Group, Inc. v. American Motorists Ins. Co.,* 276 Ill.App.3d 799, 213 Ill.Dec. 317, 658 N.E.2d 1338, 1345 (1 Dist.1995). The Illinois Courts have found delays such as in the case at bar unreasonable as a matter of law. *See, Casualty Indemnity Exchange v. Village of Crete,* 731 F.2d 457, 459 (7th Cir.1984) (Notice given 18 months after the occurrence, five months after lawsuit filed); *Illinois Valley Minerals Corp. v. Royal–Globe Ins. Co.,* 70 Ill.App.3d 296, 26 Ill.Dec. 629, 388 N.E.2d 253, 256–7 (3 Dist.1979) (Notice given six months after occurrence).

The Laserage defendants contend that the Court cannot grant summary judgment because there is a material issue of fact as to whether they gave reasonable notice to the insurers. The Court disagrees. It is undisputed that after being sued in a $10 million lawsuit, the defendants waited eight months before notifying the plaintiffs of the lawsuit. It is undisputed that the sole reason the defendants failed to give notice was that they did not think their policies provided coverage, notwithstanding the fact that they never actually read their policies. It is undisputed that during this period of delay, the defendants were represented by general counsel and by separate litigation counsel, neither of whom advised the defendants to notify their insurers. Finally, it is undisputed that the defendants' attorney, Richard Winter, admitted that after reviewing the *Zsamboky* complaint, it was not a "difficult analysis" to determine that the insurers should be notified.

The defendants further contend that their delay in giving notice was reasonable, because the underlying complaint was complex and they did not know that their insurance might cover the claim. However, the insured is required to exercise due diligence to determine whether there is insurance coverage. *INA Ins. Co. of Ill. v. City of Chicago,* 62 Ill.App.3d 80, 19 Ill.Dec. 519, 379 N.E.2d 34, 37 (1 Dist.1978). Here, the defendants admit that they did not even examine their insurance policies after they were sued Considering that they were being sued for $10 million, the Court finds this lack of diligence clearly unreasonable.

CONCLUSION

Accordingly, the application to strike references to certain extrinsic materials [93]and the applications for summary judgment [68–1] [69–1] [71–3] [72–1] are granted, the applications for default judgment on the counterclaim [110] and for reconsideration [126] are denied, and the remaining applications [71–1] [71–2] [112] are dismissed as moot.

So ordered.