**WINKLEVOSS CONSULTANTS, INC. and Howard Winklevoss, Plaintiffs,**

v.

**FEDERAL INSURANCE CO., Defendant.**

No. 97 C 1621.

United States District Court, N.D. Illinois, Eastern Division.

July 22, 1998.

See also, 991 F.Supp. 1024.

John Stanley Vishneski, Neal, Gerber & Eisenberg, Chicago, IL, Paul R. Walker-Bright, Keck, Mahin & Cate, Chicago, IL, David A. Stall, Jeffrey D. Diamond, David A. Gauntlett, Gauntlett & Associates, Irvine, CA, for Plaintiffs.

Robert Marc Chemers, Michael Anthony Clarke, Daniel Gene Wills, Pretzel & Stouffer, Chtd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Today we issue our third opinion in this insurance coverage dispute in an attempt to bring an end to this piecemeal litigation. Earlier this year, this Court ruled that defendant Federal Insurance Company had no duty to defend plaintiff Winklevoss Consultants under insurance policy provisions for "advertising injury" against a lawsuit entitled *Lynchval Systems, Inc. v. Chicago Consulting Actuaries*, 1998 WL 151814 (1998) *et al.* That ruling was limited, at Winklevoss' insistence, to the original complaint filed in the *Lynchval* suit. Because the allegations in that complaint claimed injury arising solely out conduct that had no connection to advertising or a covered advertising injury offense, we held that the complaint held no potential for coverage, negating any duty to defend.[1] *See Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 991 F.Supp. 1024 (N.D.Ill.1998) (*"Winklevoss II "*). Before the Court are the

---

1. In our first opinion, we held that (1) the issue of Federal's duty to indemnify Winklevoss will not be ripe until the *Lynchval* suit ends; and (2) underlying plaintiff Lynchval is neither an indispensable nor a necessary party to this declaratory judgment suit under Fed.R.Civ.P. 19. *See Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 174 F.R.D. 416 (N.D.Ill.1997) (*"Winklevoss I "*). We thus denied Federal's Fed.R.Civ.P. 12(b)(7) motion to dismiss for failure to join an indispensable party; however, we administratively dismissed the portion of the suit relating to Federal's alleged duty to indemnify. *Id.* 174 F.R.D. at 419.

parties cross-motions for partial summary judgment on whether the new claims and allegations in Lynchval's Second Amended Substitute Complaint ("SASC") trigger a duty to defend. Federal is currently defending the SASC under a reservation of rights.

The cross-motions before us are premised on both parties' cross-claims. Federal has filed a five-count amended counterclaim requesting that it be relieved from its current defense duties, insisting that any defense-triggering allegations that may once have inhabited the SASC have since been dismissed. Counts I and II request a declaratory judgment that Federal owes no defense obligations under the CGL and Umbrella policies that it issued to Winklevoss. Count III seeks a declaratory judgment that Federal may withdraw its current defense. Count IV asks for reimbursement of defense costs to date based on lack of coverage, and Count V asks for reimbursement due to the alleged unreasonableness of the fees to date. Winklevoss has responded with its own amended two-count counterclaim.[2] Count I seeks a declaratory judgment that Federal has a duty to defend Winklevoss against the SASC, and that this duty relates back to the *Lynchval* suit's inception. Count II requests a declaratory judgment that Federal breached its insurance contracts by refusing to defend Winklevoss from the beginning of the *Lynchval* litigation.

We hold that the SASC does trigger defense obligations under both the CGL and Umbrella policies' provisions for advertising injury, but that this duty was not triggered until the SASC was tendered to Federal in January 1996. As such, the parties' motions are granted in part and denied in part, as detailed in this opinion.

## LEGAL STANDARDS AND ANALYSIS

The facts in this case were described at length in *Winklevoss II*, 991 F.Supp. at 1026–30; we refer to them here only as necessary to analyze the claims before us. Likewise, the standards for summary judgment, which is proper when no genuine issue of material facts exists and the moving party is entitled to judgment as a matter of law, were outlined in our earlier opinion, *see id.* 991 F.Supp. at 1029, and are well-established. We thus move on to the issue at hand: do the allegations in the SASC trigger a duty to defend under the CGL and Umbrella policies' provisions for advertising injury?

The Seventh Circuit recently reiterated the standards for determining whether an insurance company has a duty to defend under Illinois law [3]:

> To determine whether the insurance company owes its insured a defense, the court must simply compare the allegations of the underlying complaint against the insured to the pertinent provisions of the insurance policy. If the complaint against the insured alleges facts that fall or potentially fall within the coverage of the policy, then the insurance company is bound to supply a defense. If, on the other hand, it is clear from the face of the underlying complaint that the allegations do not even potentially fall within the scope of the policy, then the insured must mount its own defense. Of course, the court must construe the complaint against the insured liberally, and any doubts as to the insurer's duty must be resolved in favor of the insured. Moreover, the possibility that not all of the injuries complained of in the complaint may be covered does not obviate the duty to defend; so long as at least some injuries potentially fall within the scope of the policy, the insurer must defend the insured.

*Roman Catholic Diocese of Springfield v. Maryland Cas. Co.*, 139 F.3d 561, 565 (7th Cir.1998) (citations omitted) [hereinafter *RCD* ].[4] Applying these standards, we find

---

**2.** Winklevoss has also interposed four affirmative defenses, whose applicability we need not reach given our ruling today.

**3.** The parties agree that Illinois law governs the CGL and Umbrella policies, and that agreement controls the choice of law determination here. *See Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir.1998) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law

applies.") (internal quotations and citations omitted).

**4.** Although *RCD* reviewed a district court's 12(b)(6) dismissal, these same standards are equally applicable to summary judgment motions raising the duty to defend—as shown by *RCD*'s reliance on Illinois Supreme Court decisions reviewing summary judgment rulings. *See, e.g., Lapham–Hickey Steel Corp. v. Protection Mut. Ins.*

that the SASC, construed liberally in Winklevoss' favor, alleges facts that "potentially" fall within the CGL and Umbrella policies' advertising injury provisions.

## I. The SASC's Allegations Satisfy the Requisites for Advertising Injury

■ Both policies (effective April 5, 1994—April 5, 1995) pledge to defend suits claiming "advertising injury," [5] defined as:

> injury arising solely out of one or more of the following offenses committed in the course of advertising your goods, products or services:

> 1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> 2. oral or written publication of material that violates a person's right of privacy;

> 3. misappropriation of advertising ideas or style of doing business; or

> 4. infringement of copyrighted advertising materials, titles or slogans.

*See Winklevoss II,* 991 F.Supp. at 1027–28. In *Winklevoss II,* we held that these provisions comprise three elements: (1) the insured must have engaged in advertising activity; (2) the underlying complaint must contain allegations that fit one of the enumerated offenses; and (3) the injury to the underlying plaintiff must have arisen solely out of the insured's offense committed in the course of its advertising. *Id.* 991 F.Supp. at 1031 (citation omitted).

New allegations in the SASC meet these requirements, triggering the potential for coverage under the policies' advertising injury provisions. Under Count IX, which claims false advertising in violation of Lanham Act section 43(a)(2), Lynchval alleges that Winklevoss made false and misleading negative statements about Lynchval's products in the course of Winklevoss' advertising:

171. Upon information and belief, the defendants CCA and Winklevoss have disseminated promotional materials making, *inter alia,* the following and other explicit or implied misrepresentations, falsehoods or intentionally misleading distortions . . . .

> c. That defendants' "Proval" software is supposedly "unlike any other system we are aware of" and supposedly "allows senior actuaries to be 'hands on' with respect to consulting assignments," but that *somehow plaintiff's "Lynchval" software does not.*

> g. That supposedly "our actuaries can 'code up' a valuation in a fraction of the time required by other systems . . . .", *which comparative statement was false.*

> 1. That although CCA uses "Lynchval" software, CCA supposedly would use "Proval" for retiree medical valuation purposes "including FAS 106´ expense" and for forecasting "retiree medical expenses," even though CCA knew that defendants' "Proval" software had no such capabilities.

SASC ¶ 171 (emphasis added). Count IX further alleges that "the listed misrepresentations of the defendants, as well as others, are false and/or misleading representations relating to the nature of *both parties' products,* and constitute violations of 15 U.S.C. § 1125(a)." *Id.* (emphasis added). This last statement is repeated in Counts X (violation of the Illinois Uniform Deceptive Trade Practices Act) and XI (violation of the Illinois Consumer Fraud and Deceptive Business Practices Act). *Id.* ¶¶ 181, 187. Finally, the SASC claims that these "unlawful acts" have caused Lynchval to lose past and future sales. *Id.* ¶¶ 177, 183, 189.

Federal concedes that these allegations satisfy the first and third advertising injury elements—that Winklevoss was engaged in "advertising activity," and that the alleged wrongdoing occurred in the course of advertising. Def.'s Br. at 4 ("The new counts in

*Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842 (1995); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992).

**5.** This is true with respect to the Umbrella policy's Coverage A ("Excess Follow Form Liability coverage"), which provides "coverage in excess of the total applicable limits of underlying insurance" and incorporates the CGL's definition of advertising injury. The Umbrella policy's Coverage B ("Umbrella Liability coverage"), however, is subject to an endorsement that deletes coverage for advertising injury.

the underlying amended pleading clearly allege that the newly complained of conduct occurred through advertising."). These allegations also meet the second advertising injury requirement because they fit the enumerated offense "oral or written publication of material that ... disparages a person's or organization's goods, products or services."

In *Winklevoss II,* we quoted another district court's definition of the word "disparage" in this covered policy offense: " '[a] statement about a competitor's goods which is untrue or misleading and is made to influence the public not to buy.' " *DecisionOne Corp. v. ITT Hartford Ins. Group,* 942 F.Supp. 1038, 1043 (E.D.Pa.1996) (quoting BLACK'S LAW DICTIONARY (6th ed.1990)). We noted that the original *Lynchval* complaint contained no allegations suggesting that Winklevoss said anything at all about Lynchval, much less anything negative and misleading. 991 F.Supp. at 1039–40. Rather, the allegations were simply that Winklevoss had promoted its own product, and the alleged wrongdoing was that Winklevoss had developed its product by misappropriating Lynchval's trade secrets, not that Winklevoss misled the public with negative statements about Lynchval's product. *Id.*

But the SASC clearly contains allegations of fact that Winklevoss made false statements about Lynchval's goods in attempt to steer customers away from Lynchval's product and toward Winklevoss' product. The claims that Winklevoss falsely advertised in its promotional materials that its software was capable of "allow[ing] senior actuaries to be 'hands on' with respect to consulting assignments," but Lynchval's software was not; that Winklevoss made false comparative statements about the speed of its software relative to competitors; and the specific allegation that Winklevoss made misleading statements about the nature of both parties' products all satisfy the above laymen's definition of "disparage." *See Millers Mut. Ins. v. Graham Oil Co.,* 282 Ill.App.3d 129, 218 Ill. Dec. 60, 668 N.E.2d 223, 228 (1996) (policy terms must be given their plain, ordinary, and popular meaning), *appeal denied,* 168 Ill.2d 598, 219 Ill.Dec. 567, 671 N.E.2d 734 (1996). At least one paragraph claims that Winklevoss mentioned Lynchval by name, and, given this context, we can easily infer

from the other paragraphs further alleged misleading, negative comparisons to Lynchval's products. *See RCD,* 139 F.3d at 567 ("the complaint need not allege or use language affirmatively bringing the claims within the scope of the policy, as the question of coverage should not hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action.").

Moreover, the SASC alleges that Lynchval was injured by Winklevoss' false comparative advertising in that it lost and continues to lose sales as a result. *See Winklevoss II,* 991 F.Supp. at 1036 (complaint must allege causal connection between advertising injury and advertising activity). Thus, it satisfies the majority rule to which we adhered in *Winklevoss II*—that the advertising must have caused the injury in order to trigger the potential for coverage under "advertising injury." *See id.* ("Allegations that an insured's advertisements made false comparisons to a competitor forge a strong link between misconduct and advertising."). This is in contrast to the allegations in the original complaint, which were "limited to Winklevoss' [allegedly illicit] development of a competing product—conduct that took place long before Winklevoss began its promotional efforts." *Id.* 991 F.Supp. at 1033.

Our conclusion that the SASC's allegations fit the covered offense of disparagement is well-supported by analogous authority, including one of this Court's earlier decisions. *See Sun Elec. Corp. v. St. Paul Fire & Marine Ins. Co.,* 1995 WL 270230, at *5 (N.D.Ill. May 4, 1995) (underlying allegations that insured falsely advertised that it was more experienced than its competitors, that the plaintiff was a newcomer to the industry, that the insured's experience was unequaled, and that the insured disparaged the plaintiff triggered a duty to defend under the covered advertising injury offense "written or spoken material that belittles the products or work of others"); *Amerisure Ins. Co. v. Laserage Tech. Corp.,* 2 F.Supp.2d 296 (W.D.N.Y.1998) (applying Illinois law) (allegations that insured told customers that the plaintiff wrongfully infringed the insured's patents satisfied the ordinary, popular meaning of "disparage" in the insurance policy's adver-

tising injury provisions); *DecisionOne Corp. v. ITT Hartford Ins. Group,* 942 F.Supp. 1038, 1042–43 (E.D.Pa.1996) (allegations that insured "made false or misleading comparisons between itself and STK," causing customer defection, "lie within the advertising injury definition as disparaging STK's services"); *Home Ins. Co. v. Waycrosse, Inc.,* 990 F.Supp. 720, 730 (D.Minn.1996) (allegations that insured disseminated fraudulent misrepresentations about "the Device" were claims that the insured disparaged the plaintiffs' goods within the meaning of the policy, even though these allegations did not identify the "Device" as the plaintiffs' good or product), *aff'd,* 131 F.3d 143, 1997 WL 752555 (8th Cir.1997); *cf. Microtec Res., Inc. v. Nationwide Mut. Ins. Co.,* 40 F.3d 968, 971–72 (9th Cir.1994) (finding allegations did not amount to disparagement as envisioned by the policy where they did not "aver that Microtec had said anything negative about Green Hills"; but observing that if Microtec had sued insured for falsely advertising that Microtec's product had "bugs" or was "slower," such allegations would have satisfied the covered offense of disparagement).

■ Federal makes much of the fact that the *Lynchval* district court dismissed Lynchval's claim for common law product disparagement (formerly Count XII) under Rule 12(b)(6), arguing that this dismissal rid the complaint of all allegations that may have fit the covered offense of disparagement. This is incorrect for two reasons. First, the allegations that we have found to create the potential for coverage do not even appear in Count XII; rather, they appear for the first time in Count IX, the false advertising claim. Count XII simply incorporates these allegations, as do Counts X and XI. While Count XII was dismissed, Counts IX, X and XII (and their accompanying factual allegations) remain in the complaint. Second, the policy offense of "disparagement" is not synonymous with common law commercial disparagement. *See Sun Elec.,* 1995 WL 270230, at * 4 (rejecting insurer's argument that the allegations did not fit a covered offense because they did not meet all the elements of a commercial disparagement claim; "the inquiry is not whether the allegations in the complaint support an independent theory of relief ... but whether any portion of the allegations comprising the claims which are stated in the complaint fall within one or more of the categories of wrongdoing that the policy covers.") (internal quotations and citations omitted); *id.* 1995 WL 270230 at *5 ("A claim for relief is not essential; only the allegations in the complaint must fall within the covered provisions."); *Amerisure,* 1998 WL 210948, at *7 (rejecting as "misplaced" the insurer's contention that "a duty to defend does not arise unless the underlying complaint alleges facts which constitute the offense of commercial disparagement under Illinois law"). The SASC still includes factual allegations that Winklevoss made false negative comparative statements about Lynchval's goods, causing Lynchval to lose sales. It does not matter that these allegations may not meet the technical requisites for stating a commercial disparagement claim.

■ Federal's judicial estoppel argument fails for the same reason. Federal contends that because Winklevoss successfully argued for Count XII's dismissal on a 12(b)(6) motion, it is now estopped from arguing that the SASC contains allegations that create the potential for coverage under the policy offense of disparagement. But the determination of whether an allegation potentially triggers coverage under the popular and ordinary meaning of the word "disparage" is a far cry from determining whether a complaint's allegations fail to state a viable claim for common law product disparagement. *See Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 679 A.2d 540, 544–45 (1996) (duty to defend is triggered by alleged action "that is potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be"). There is no evidence that the parties intended "disparage" to refer exclusively to the common law tort of product disparagement, and, in the absence of such a showing, Illinois law is clear that unambiguous words in an insurance policy must receive their plain, ordinary meaning. *See Outboard Marine Corp. v. Liberty Mut. Ins.,* 154 Ill.2d 90, 108–09, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992). Thus, the positions Winklevoss has taken are not so incompatible that they warrant applying the doctrine of judicial estoppel.

In sum, we simply cannot "say with confidence that no injuries comprehended by the complaint would potentially trigger coverage." *RCD*, 139 F.3d at 566–67. Federal has a duty to defend Winklevoss against the SASC because the allegations in that complaint claim that Winklevoss made false, negative comparative statements about Lynchval's goods in the course of its advertising, and that Lynchval lost business as a result. We must now determine when that duty was triggered.

## II. Federal's Duty to Defend Was Triggered by Winklevoss' January 1996 Tender of the SASC, Not By the Filing of the Lynchval Suit

 Winklevoss argues that Federal's duty to defend based on the SASC relates back to the inception of the *Lynchval* suit. The general rule under Illinois law is that the duty to defend is triggered when the insurer receives "actual notice" of a claim potentially falling within policy coverage, which often occurs on the date of tender. *See Federated Mut. Inc. Co. v. State Farm Mut. Auto. Ins. Co.*, 282 Ill.App.3d 716, 726, 218 Ill.Dec. 143, 668 N.E.2d 627, 633 (1996).

Winklevoss asks us to ignore this rule. In a thinly veiled attempt to undercut our earlier ruling that Federal did not have a duty to defend the original *Lynchval* complaint, Winklevoss maintains that the SASC's allegations merely clarify the vague allegations in the original complaint, demonstrating that the original complaint held the potential coverage from the very beginning. Winklevoss urges that Federal's duty to defend relates back accordingly.

We reject this "clarification" argument, which borders on the frivolous. *Winklevoss II* firmly and unequivocally held that the original *Lynchval* complaint did not create the potential for coverage under the advertising injury provisions of Federal's insurance policies. The misconduct alleged in that complaint was confined to Winklevoss' misappropriation of trade secrets to develop a competing product, and did not deal with anything Winklevoss said or did while promoting the product. 991 F.Supp. at 1035. Specifically, the injury lay in Winklevoss' taking of Lynchval's trade secrets and illicitly drawing on those trade secrets to develop its own

software, not in how the software was advertised or how it was advertised in comparison to Lynchval's product. In arguing that the SASC clarifies the way in which Winklevoss' promotional efforts referenced in the original complaint injured Lynchval, Winklevoss blatantly ignores our finding that, even interpreting the complaint liberally in favor of Winklevoss, it failed to allege any connection between advertising and injury.

Simply put, the SASC's new defense-triggering allegations are premised upon entirely different conduct than was alleged in the original complaint, and cannot be considered to "clarify" the original claims. The original eight counts concerned only theft and misuse of trade secrets in developing a competing software product. But the new allegations unmistakably claim wrongdoing in connection with Winklevoss' advertising—specifically, that Winklevoss misrepresented the features and capabilities of both its own and Lynchval's products—and are contained in counts separate from the claims in the original complaint. Indeed, the original claims are repeated verbatim in the first eight counts of the SASC, exposing the fallacy of Winklevoss's contention that these counts were somehow "vague" or required clarification.

Significantly, Winklevoss cites no authority that supports its novel "relation back" theory. It relies instead on several cases holding that an insurer has a duty to defend if it knows about "true but unpleaded facts which when taken together with the allegations in the complaint indicate that the claim is potentially covered by the policy." *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 193 Ill.App.3d 1087, 1094, 140 Ill.Dec. 907, 550 N.E.2d 1032, 1036 (1989), *aff'd*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991); *see also Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 827 (7th Cir.1992) (same); *Kufalk v. Hart*, 636 F.Supp. 309, 311 (N.D.Ill.1986) (same); *Associated Indemnity Co. v. Insurance Co. of N. Am.*, 68 Ill.App.3d 807, 816, 25 Ill.Dec. 258, 386 N.E.2d 529, 536 (1979) ("[E]ven though the complaint, standing alone, may not fairly apprise the insurer that the third party is suing the putative insured on an occurrence potentially within the policy's coverage, the insurer is ·obligated to conduct the putative insured's defense if the insurer has knowl-

edge of true but unpleaded facts which, when taken together with the complaint's allegations, indicate that the claim is within or potentially within the policy's coverage."). But Winklevoss points to no "true but unpleaded facts" at all, much less true but unpleaded facts raising the potential for coverage that came to Federal's knowledge before Winklevoss tendered the SASC.

Winklevoss cites no deposition testimony or exhibits that came to light before its tender of the SASC that, when viewed in conjunction with the original complaint, show that its allegations held the potential for coverage. The only material, aside from the SASC, to which Winklevoss directs us is an amended complaint (the "Second" complaint) that Lynchval filed sometime after the original complaint and sometime before the SASC. This complaint contains the new allegations present in the SASC. But Winklevoss has no proof that it tendered this complaint to Federal, or that Federal knew about it through other means. Moreover, just as the SASC does not "clarify" the original complaint, the Second complaint (which mirrors the SASC in all relevant respects) likewise fails to "clarify" the original complaint.

These facts render Winklevoss' cited authority inapposite. Those cases all involved vague complaints that were clarified by later fact discovery, or that, liberally construed, held the potential for coverage from the very beginning. See *Travelers*, 974 F.2d at 829 (holding that the complaint's allegations that "[t]he lithograde polystyrene sheets supplied by Penda were unusable and unacceptable" could be read to claim property injury in light of deposition testimony that plaintiff sought compensation for damages caused by the defective sheets); *Kufalk*, 636 F.Supp. at 311–12 (complaint's lack of specificity as to extent of injury was cured by plaintiff's deposition testimony); *United States Fidelity*, 193 Ill.App.3d at 1094, 140 Ill.Dec. 907, 550 N.E.2d at 1036 (holding that underlying complaints filed by several plaintiffs all contained "express allegations of 'property damage'," and that because all complaints arose from the same set of circumstances, "the allegations in any single complaint can be inferred in the other complaints"); *Associated Indemnity Co.*, 68 Ill.App.3d at 818, 25 Ill.Dec. 258, 386 N.E.2d at 538 (insurer knew about true but unpleaded facts creating the potential for coverage because it was defending another party in the underlying lawsuit); *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779, 784–86 (1995) (complaint's original allegations "le[ft] open the potentiality" that the plaintiffs' injuries occurred during the relevant policy period). In this case, there is no evidence that Federal had any knowledge of the potential for coverage until Winklevoss tendered the SASC in January 1996. As such, Federal had no duty to defend before that point.

In sum, Federal's duty to defend began on the date of the SASC's tender, not at the beginning of the *Lynchval* lawsuit. We stand firm on our earlier holding that the original *Lynchval* complaint could not possibly be read hold the potential for coverage.

## CONCLUSION

Our holding that Federal has a duty to defend the SASC from the date of its tender translates into several rulings on the parties' cross-motions for summary judgment. First we address Federal's five-count amended counterclaim. As to Counts I, II, and III, which seek a declaratory judgment regarding Federal's duty to defend the SASC under Winklevoss' CGL and Umbrella policies, summary judgment is granted to Winklevoss and denied to Federal. As to Count IV, which seeks reimbursement of defense costs from September 30, 1996 onward, summary judgment as to liability is granted to Winklevoss and denied to Federal. Count V, which requests a ruling on the reasonableness of expended defense costs, is dismissed without prejudice as premature. The amount of damages to be awarded on Count IV and the potential repleading of Count V may need to await the conclusion of the underlying *Lynchval* litigation.

We make the following rulings on Winklevoss' amended two-count counterclaim. As to Count I, which seeks a declaratory judgment that Federal has a duty to defend Winklevoss from the inception of the *Lynchval* suit, summary judgment is granted in part and denied in part to both parties. It is granted to Winklevoss and denied to Federal insofar as we hold that Federal has a duty to defend under the SASC, and granted to Federal and denied to Winklevoss insofar as we

hold that Federal's duty does not relate back to the inception of suit. On Count II alleging breach of contract, we grant summary judgment to Federal and deny it to Winklevoss. As we held in *Winklevoss II*, Federal did not breach its insurance contracts by refusing to defend the original *Lynchval* complaint. 991 F.Supp. at 1041. And since Federal is currently defending the SASC under a reservation of rights, it cannot be held to have committed a breach in response to Winklevoss' request to defend that complaint. *See Maneikis v. St. Paul Ins. Co.*, 655 F.2d 818, 822–23 (7th Cir.1981) (inquiry in breach of insurance contract action is whether insured "wrongfully failed to defend" the insured).

Because the indemnity portion of this suit has already been administratively dismissed, this opinion concludes all matters in this litigation until the *Lynchval* suit ends. The Clerk of the Court is directed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of Winklevoss on Counts I–IV of Federal's amended counterclaim, and on Count I of Winklevoss' amended counterclaim insofar as Federal must defend the *Lynchval* suit from the SASC's tender date. Judgment should be entered in favor of Federal on Count I of Winklevoss' amended counterclaim insofar as it need not defend the *Lynchval* suit from its inception, and on Count II of Winklevoss' amended counterclaim.