# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**MHM Services, Inc. v. Assurance Co. of America**, 2012 IL App (1st) 112171

---

| | |
|---|---|
| Appellate Court Caption | MHM SERVICES, INC., Plaintiff and Counterdefendant-Appellant, v. ASSURANCE COMPANY OF AMERICA, Defendant and Counterplaintiff-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2171 |
| Filed | August 3, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff was not entitled to $2.5 million from its excess/umbrella insurer to pay a $3.5 million tort settlement where plaintiff failed to comply with the "as soon as practicable" notice clause in the excess insurance contract, especially when plaintiff was not entitled to exercise its discretion in giving notice, and in this case, it waited 25 months to inform defendant of the underlying suit; therefore, defendant was relieved of its duties to defend and indemnify. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CH-40608; the Hon. Mary Ann Mason, Judge, presiding. |
| Judgment | Affirmed; motion taken with the case denied. |

Counsel on
Appeal

John S. Vishneski III, Michael D. Richman, and Noel C. Paul, all of Reed Smith LLP, of Chicago, for appellant.

Brian A. O'Gallagher and Jeanne Zeiger, both of Cremer, Spina, Shaughnessy, Jansen & Siegert LLC, of Chicago, for appellee.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    This is an appeal from a three-count action in which an insured unsuccessfully sought $2.5 million from its excess/umbrella insurer to help satisfy a $3.5 million tort settlement. The circuit court ruled that the insured breached the notice clause of its insurance contract and was, therefore, not entitled to any insurance proceeds. The court granted the insurer's motion for summary judgment and denied the insured's cross-motion for summary judgment on its claims for declaratory judgment, breach of contract, and bad-faith handling of the claim. The insured's primary argument on appeal is that it was reasonably diligent, instead of untimely, in presenting its insurance claim.

¶ 2    Our first consideration is the insurer's motion to strike the statement of facts section of the insured's opening appellate brief. This motion was ordered taken with the case. The insurer contends the insured's brief violates the mandate of Supreme Court Rule 341(h)(6) that the appellant provide a factual recitation that is relevant, accurate and fair, without argument or comment. Ill. S. Ct. R. 341(h)(6) (eff. July 1, 2008); *Board of Managers of Eleventh Street Loftominium Ass'n v. Wabash Loftominium, LLC*, 376 Ill. App. 3d 185, 187-88, 876 N.E.2d 65, 68 (2007) (striking statement of facts that was argumentative, did not convey "a complete picture of the proceedings" and omitted facts necessary to understand the issues on appeal). The insurer has provided its own statement of facts. We agree that the insured's version is argumentative, occasionally lacks citation to the record on appeal, conveys insufficient facts in some respects and irrelevant detail in others, and is unnecessarily confusing. In our discretion, we deny the motion to strike but have disregarded the insured's improper statements and resorted, to some extent, to the insurer's statement of facts to present the pertinent history of this case.

¶ 3    The insured is MHM Services, Inc., which we will refer to as MHM. MHM contracts to provide healthcare services, including mental health services, on behalf of governmental entities. In April 2003, MHM contracted with the Illinois Department of Corrections, which we shall refer to as IDOC, to screen IDOC inmates who were nearing the end of their prison terms but were candidates for indefinite confinement as provided by the Illinois Sexually

-2-

Violent Persons Commitment Act. 725 ILCS 207/1 *et seq.* (West 2002). The Illinois Department of Human Services maintains a secure mental health facility in the city of Joliet for sexually violent persons (sometimes shortened to "SVPs") who have been committed to the State's care through civil commitment proceedings. See 725 ILCS 207/50(b) (West 2002).

¶ 4    On June 5, 2006, A.B. sued MHM, alleging that in 2004 it negligently failed to recommend the State of Illinois pursue the indefinite confinement of Christopher Hanson as a sexually violent person. Hanson had been eligible for parole in late 2004 but had a series of criminal convictions, most of which were for sexual assaults on women in Libertyville, Illinois. In 1993, he had been convicted of the criminal sexual assault of a woman in Libertyville, sentenced to 11 years in prison, but paroled in 1999. In 2000, Hanson was convicted of the attempted assault of another woman in Libertyville for which he received an eight-year prison sentence. Hanson was released on parole in 2003, but returned to incarceration in August 2004 because he violated the parole terms, and then released in October 2004. Within eight months of his release, Hanson attacked A.B., then a teenager, on June 6, 2005, while she was running on a bike path in a forest preserve in Libertyville. He sexually assaulted A.B., stabbed her in the neck, and repeatedly cut her throat until she appeared lifeless. A.B. was "playing dead" when Hanson checked whether she was still breathing, dragged her 60 to 80 yards into a thicket of tall grass, covered her with dried brush and dirt, walked off, and then circled back to the thicket to hide the pieces of her torn clothing. A.B. continued to remain motionless in the thicket for more than an hour before walking to the nearest house to find help. After she identified Hanson in a photo array, he was located and arrested. He still had the knife he used to attack A.B. and was in disbelief that she survived his vicious assault and stabbing. He was tried, convicted, and incarcerated for aggravated criminal sexual assault, aggravated kidnapping, and attempted murder. A.B.'s lawsuit in the circuit court of Lake County sought damages from Hanson for assault and battery and from MHM for negligently failing to perform a prerelease screening for Hanson's civil commitment as a sexually violent person.

¶ 5    MHM had two liability insurers. MHM had professional liability coverage through CampMed Casualty and Indemnity Company (hereinafter CampMed), which could provide up to $1 million, in addition to MHM's self-insured retention of $250,000. MHM had both primary commercial general liability and property coverage up to $1 million and commercial umbrella/excess coverage up to $5 million through the current defendant-appellee, Assurance Company of America (hereinafter Assurance). Assurance is indirectly owned by Zurich American Insurance Company. Assurance is a New York corporation whose principal place of business is in Schaumburg, Illinois, and MHM is a Delaware corporation which does business primarily from its corporate headquarters in Vienna, Virginia.

¶ 6    When MHM was served with A.B.'s suit on June 14, 2006, the company's then-general outside counsel tendered the case to CampMed, but not to Assurance. MHM's general outside counsel was Lee Calligaro, who served in that capacity between 1999 and 2008 and did mostly contract review for the company. Calligaro testified that the typical cases MHM defended concerned employment issues or business competition, or were "prisoner cases," brought by inmates regarding the mental health care they received from MHM. The

employment cases bypassed Calligaro and went straight to the company's human resources director; the business competition suit was one of the few "outlying" cases which Calligaro handled himself; and the bulk of the cases were the "numerous, numerous prisoner cases"–nearly all of which were frivolous–that Calligaro would forward to CampMed so they would provide the defense. In an affidavit, MHM's chief financial officer (CFO) Susan D. Ritchey said that about 95% of the medical malpractice/professional liability lawsuits against MHM were dismissed as frivolous, that MHM spent an average of $10,000 defending each case, and that it had been required to settle only three of them, at an average settlement cost of $25,000. Thus, MHM "had always paid for all of its defense and indemnity costs prior to settlement of the A.B. suit." At his deposition in this insurance coverage action, Calligaro testified that A.B.'s suit was "the first case that [he] had seen in all the time [he] represented [MHM] in which there was a suggestion of potentially substantial liability." Because he was concerned about the "potential emotional appeal or reaction" to what Hanson had done to A.B., "shortly after" being served and tendering the case to CampMed, Calligaro asked MHM's controller and either its chief executive officer (CEO) Michael S. Pinkert or CFO Ritchey "whether or not there was *** any other kind of policy or excess coverage *** that might cover the suit." Although Calligaro recalled getting a negative response, the three people that he purportedly asked at MHM denied that he asked this question as early as 2006.

¶ 7        In any event, when CampMed received notice on June 16, 2006, it exercised its right to hire Chicago attorney Jeffrey Singer to defend MHM. Singer's initial approach was to move to dismiss the suit on grounds of sovereign immunity.

¶ 8        On July 18, 2006, psychiatrist Dr. Michael H. Fogel, the director of IDOC's mental health services sex offender evaluation unit, forwarded several internal e-mails to Calligaro. The e-mails had been written shortly after Hanson attacked A.B. on June 26, 2005, and they were problematic for MHM's defense of her accusations. In the first e-mail, dated June 9, 2005, Dr. Fogel told the "SVP Evaluation Unit Supervisor" that around the time of Hanson's evaluation and release in 2004, the atmosphere at MHM was "chaotic," MHM had failed to even document who examined the file, and the file did not fully convey Hanson's criminal past. This was in part because the record of Hanson's sexual attacks had been physically separated and filed apart from the record of his aggravated battery, but the evaluator might not have known about this "filing procedure." Furthermore, the contents of the aggravated battery file were "limited" and stated only that Hanson "knowingly caused bodily harm to Lucinda Moore [in 2000] in that he struck her about the head" in an encounter on the Forest Lane Bike Path. In the second e-mail, the SVP evaluation unit supervisor asked Dr. Fogel on June 9, 2005, to "pull together as much information as you have on this person," in order to "make our case for non-referral." Later that same day, Fogel responded with a list of the "[p]roblems that occurred with this case." Dr. Fogel reiterated and added detail to his prior message, stating that as best as he could piece together, it appeared Hanson's evaluation was based solely on the incomplete aggravated battery file. He added that the psychiatrist who probably looked at the file was a man who had used the wrong guidelines to determine eligibility for civil confinement.

¶ 9        A.B. was alleging damages in excess of $50,000 for the permanent, visible scarring, medical expenses, pain and suffering, and loss of a normal life she was experiencing;

however, on September 30, 2006, MHM decided to reserve only $10,000 to defend and satisfy its liability in the case. On November 26, 2006, MHM's sovereign immunity motion was denied and discovery ensued. CampMed set its reserves without any input from defense counsel Singer and on February 20, 2007, the company established an initial indemnity reserve of $100,000. By September 30, 2007, MHM had paid $36,000 toward its defense costs and was estimating that it would incur an additional $50,000 to $100,000 in legal costs, so it increased its expense accrual for the A.B. suit to $75,000.

¶ 10 On October 16, 2007, attorney Singer filed MHM's motion for summary judgment, asserting a variety of arguments, including that Hanson did not meet the criteria for civil commitment, in part because he was serving time for a parole violation and aggravated battery, which are nonsex offenses; MHM's conduct was not the proximate cause of A.B.'s injuries; Hanson's attack was an unforeseeable and intervening cause of A.B.'s injuries; and MHM benefitted from IDOC's statutory immunity for its acts or omissions in connection with the Act. That same day, Calligaro forwarded a copy of the summary judgment motion to MHM CEO Pinkert, chief operating officer (COO)/president Steven H. Wheeler, and CFO Ritchey, and reminded them that Singer and CampMed's Director of Claims Marian McTague "believe we should solicit a settlement demand from plaintiff while the motion is pending, and use any uncertainty it may create in the mind of plaintiff's counsel to try to settle the case." Calligaro indicated the motion had merit but could be denied, and that the case "cannot be taken to a jury, regardless of the merits," because Hanson's attack was "so horrible that a jury will want to hold someone responsible, [IDOC is probably immune from liability] and we are the only solvent party involved." "In short, if we lose this motion, we have no other motions to avoid a trial. Therefore, even if the motion might win, to rely on it is taking a big chance."

¶ 11 On March 11, 2008, the judge denied MHM's motion for summary judgment. In addition, the judge vigorously urged Singer and A.B.'s attorney to settle the case instead of trying it to a jury. The judge anticipated that a jury would undoubtedly return a verdict against MHM and award A.B. $5 million to $7 million, which was well above the $1 million limits of MHM's primary coverage from CampMed. In written interrogatory answers it filed in the present insurance coverage action, MHM stated that its "perception of the case" was "altered suddenly and dramatically" by the judge's summary judgment ruling and suggestion that MHM was, without question, facing a multimillion dollar jury verdict.

¶ 12 The day after the summary judgment ruling, on March 12, 2008, CampMed increased its reserve to $500,000, reflecting the belief of at least the insurer's president/CEO, Dennis R. Santoli, that the case would settle "somewhere in the neighborhood of $700,000." (Again, CampMed's payout would be in addition to MHM's $250,000 self-insured retention.) On March 31, 2008, MHM increased its defense expense accrual to $100,000.

¶ 13 On April 10, 2008, A.B.'s attorney issued an interrogatory to identify "any policy or policies of liability insurance" that named or covered MHM on the date of Hanson's abduction, sexual assault, and attempted murder of A.B. That same day, counsel sent a "heads up" e-mail to Singer, "in the hope that [Singer would] be able to provide this information shortly after receiving" the written discovery requests. Counsel indicated he was "[p]articularly" interested in "any excess or umbrella policies" and as soon as he had verified

-5-

answers he would "be in a position to make a settlement demand." That same day, Singer e-mailed MHM management to confirm that the CampMed policy was the only available coverage and that there was no "excess or stop loss coverage." The affidavit of MHM CFO Ritchey indicates that Calligaro's request caused her to look, for the first time, at all of MHM's insurance policies for possible coverage of A.B.'s suit. Ritchey concluded that the Assurance contract, which was a general liability policy with a professional liability exclusion, would not cover A.B.'s allegations of what Ritchey considered medical malpractice/professional liability. The next day, on April 11, 2008, Calligaro asked CampMed's claims director McTague "to confirm on the excess and umbrella coverage issue" and to respond to him within a few days. On April 15, 2008, Calligaro e-mailed Singer and McTague that he had confirmed there was no excess or umbrella coverage.

¶ 14        On April 24, 2008, Singer gave Calligaro a full written assessment of the case and his recommended course of action. According to MHM's CFO Ritchey, Singer's "first point of contact" at MHM was appropriately Calligaro, even though Calligaro himself was outside general counsel. Although some of the facts recounted in Singer's letter have already been set out above, they bear repeating to convey the tenor of the letter and the acknowledged posture of the case.

¶ 15        Singer opened the six-page letter by describing Hanson's "brutal" attack on the teenaged A.B. Hanson was a man with an "extensive sex crime history involving the same *modus operandi* of attacking women on jogging trails" and his attack on A.B. resulted in his fourth conviction using the same tactics. Singer's count of four sex crimes included the aggravated battery in 2000, which was not, on the surface, a sex crime; however, it was an attack on a woman on a jogging trail who escaped from Hanson before he could sexually assault her. In addition, during the criminal trial for the attack on A.B., two more women testified that just days before Hanson attacked A.B., he used the same *modus operandi* when he threatened them. Singer characterized A.B.'s testimony during the criminal proceedings as "articulate" and "compelling." In what was "regrettably, *** [A.B.'s] first sexual experience," "Hanson not only forced [her] to perform oral sex on him but also vaginal intercourse, followed by a second forced act of oral sex." She had the presence of mind to "appear dead" when he slit her throat and began stabbing her in the neck and she identified Hanson in a police photo lineup within hours of the attack. His attorneys offered "an 'insanity defense,' " but the jury convicted him of 11 counts of criminal sexual assault and attempted murder. MHM's investigation showed that one of its psychologists, presumably Dr. Schaab, "chose to not thoroughly review Hanson's criminal history and prison record" because Hanson was coming up for parole on the aggravated battery, which was not one of the predicate sex offenses for commitment under the Act. Dr. Schaab "believed Hanson was <u>ineligible</u> for commitment under the SVP Act" (emphasis in original), but Dr. Schaab was not using the same eligibility criterion then being used by Dr. Fogel, other MHM personnel, and other IDOC personnel, which was any prisoner with a sex crime conviction should be screened, even if that sentence had already been served or " 'discharged.' " It was clear the broader critereon would have generated a finding that Hanson was eligible for civil commitment. Singer predicted A.B.'s attorney would use Dr. Fogel's e-mails and testimony to show that MHM's training of its staff psychologists was not adequate or consistent. When interviewed by Singer, Doctors

Schaab, Fogel, and Levinson described "the overwhelming volume of work which MHM had to assume once it began its contractual relationship with IDOC" and "that the volume was so huge that a near impossible challenge existed for the few MHM psychologists working on the IDOC program." Dr. Fogel's e-mails revealed that a "serious understaffing problem prevailed at the time Hanson's file was initially reviewed." At first blush, this would show the daunting task that IDOC placed on MHM at the outset of their contract, but this testimony could be spun to demonstrate that MHM was negligent by relying on too few psychologists and that it should have hired more sooner rather than later, instead of putting the public at risk by offering such a limited number of professionals during the summer of 2004. Dr. Fogel appeared to be an intelligent and conscientious psychologist, but his willingness to offer unsolicited opinions on a variety of topics made Singer question how " 'controllable' " the doctor would be on the witness stand. In fact, neither Dr. Fogel nor Dr. Schaab would be effective on the witness stand, especially to counter the "highly sympathetic" testimony that would come from A.B. or the "compelling criticism" from her two liability experts, who would "vigorously opine" that Hanson would have been committed if recommended by MHM. Singer enclosed excerpts of the criminal trial transcript to convey the " 'power' " of A.B.'s testimony and other evidence which likely would be repeated in a civil trial against MHM.

¶ 16       Singer outlined MHM's defense options, which were very limited. A civil jury would be told that Hanson "would never have been released" and A.B. would not have been brutally attacked if MHM had done an adequate file review. Singer believed that arguing to the contrary would only anger a jury and result in "an even higher damages verdict against us." He reminded Calligaro that after the judge denied MHM's summary judgment motion, the judge had vigorously urged a settlement and said in no uncertain terms that no jury would ever rule in MHM's favor, that MHM was facing a verdict of $5 million to $7 million, and that MHM should immediately hire a mediator to effect a settlement. Although Singer believed an appellate court would reverse the summary judgement ruling, the trial judge would not certify the question for interlocutory appeal and had rejected a motion for reconsideration. Singer then gave his opinion that there was a "very substantial probability" of "*over 85%*" that a jury would rule against MHM and that MHM was "facing a multi-million dollar judgment." (Emphasis in original.) The liability would result from Dr. Fogel's e-mails and Dr. Schaab's use of different eligibility criteria. The large amount would result from Hanson's "criminal history as a chronic and sadistic sex offender" before A.B.'s attack, the similarity of his methods in each attack, and that he used a knife to slit A.B.'s throat after the brutal sexual assault and then tried to bury what he believed was her lifeless body. These facts would inflame the jury's passions to award a "substantial jury verdict." Furthermore, the judge's prediction of $5 million to $7 million might be too conservative, "*[a]n eight-figure jury verdict is highly probable here,*" and "[c]learly, *this is a very dangerous case for the company.*" (Emphasis in original.) Singer said that postverdict, MHM would be "in a very challenging position." MHM could gamble that an appellate court would overturn the summary judgment ruling and vacate the multimillion dollar judgment in a high profile case which was likely to generate a huge amount of media attention similar to the press coverage that had been given to the criminal case. But, Singer advised "[t]hat is quite a risk for any

company to take under the circumstances–and one which *I strongly believe should be avoided*." (Emphasis in original.)

¶ 17      A reasonable alternative was to negotiate with A.B.'s counsel. Due to the pace of discovery and A.B.'s school schedule, the proposed early-June trial date was highly doubtful and it was more likely the trial dates would be pushed to later in the year. In Singer's opinion, "any settlement reached in 'six figures' is worthy of close consideration." Singer reminded Calligaro that A.B.'s counsel had served written discovery requests for whatever insurance proceeds MHM had available for the case. Counsel had not expressed an interest in MHM's financial statements, and "[b]ased on a representation you made to me, we certainly do not want Plaintiff's counsel to seek a current MHM financial statement–a statement which will reveal a significant amount of cash and other assets." Accordingly, Singer "*strongly recommend[ed] that we provide all insurance information Plaintiff's counsel is seeking*–even insurance policies totally unrelated to the time period in controversy–with the hope Plaintiff's counsel will not consider seeking corporate financial information from MHM or its principals." (Emphasis in original.) Singer concluded:

> "[A]s you, [CampMed's] Marian [McTague] and I have agreed during several conversations in the past[,] MHM's interests are heightened by getting this case settled–and getting it settled now–as opposed to going to trial. Any reluctance toward moving forward with meaningful settlement negotiations places MHM at serious risk.
>
> *** [W]e will draft responses to Plaintiff's interrogatories and document request so we can move forward to gaining a firm settlement demand from Plaintiff's counsel."

¶ 18      On April 30, 2008, MHM increased its accrual of defense costs to $175,000 and, for the first time, accrued money toward settlement, in the amount of $100,000. During discovery in this insurance coverage action, MHM CFO Ritchey attributed the increased accrual to "gaining knowledge" of "the severity of the case" and she characterized Hanson's actions as "heinous."

¶ 19      On May 16, 2008, Singer e-mailed Calligaro and McTague about his ongoing investigation into the way MHM mishandled Hanson's review and Singer concluded, "The more I dig into the facts, the more challenging this case becomes. Not good ...."

¶ 20      On May 20, 2008, Calligaro e-mailed Singer and McTague that MHM had discovered another policy that might apply to the A.B. suit, MHM was looking at the policy, and Singer should delay answering A.B.'s interrogatory about MHM's insurance coverage. On May 23, 2008, Singer sent an e-mail to Calligaro that said:

> "I briefly reviewed the Zurich general liability policy. I don?t [*sic*] feel we even need to disclose it. The exclusions and nature of the liabilities covered show it is not applicable to this case.
>
> If MHM wishes to tender the claim to Zurich to confirm, they can do so. But, in the interim, I would not see a reason to disclose it in the discovery responses.
>
> We can?t [*sic*] get a settlement demand until we serve the discovery responses on the Plaintiff."

Singer testified that he did not recall if the Assurance policy at issue was the same he

reviewed before sending the e-mail on May 23, 2008; however, the parties have used the names Zurich and Assurance interchangeably. He was asked whether MHM should disclose that policy when it responded to A.B.'s insurance interrogatory. He was not asked to provide a coverage opinion, he was not a coverage attorney, he did not consider that subject to be his practice area, and he never advised MHM that it should not give the insurer notice of A.B.'s suit.

¶ 21 On May 28, 2008, Singer's firm served an interrogatory answer in the A.B. suit which did not disclose the existence of the Assurance policy.

¶ 22 CampMed's records indicate a meeting was called at MHM's offices in Vienna, Virginia, on May 22, 2008, which was attended by defense attorney Singer, MHM's general counsel Calligaro, and a half-dozen members of CampMed's "executive team," including the insurer's president/CEO Santoli, and the insurer's CFO, director of claims, and a claims manager. The purpose of the meeting was to discuss the viability of A.B.'s claims and whether it would be better for MHM to continue litigating or to negotiate a settlement. Santoli gave his opinion that A.B. could recover no more than $1 million through settlement or judgment and that there was "a reasonable probability" MHM could be found not liable. Santoli based his opinion on his belief that MHM did not violate its existing protocols or engage in any specific negligent act, that there were other potential, intervening causes besides MHM's conduct, and that there was no evidence of lasting impact or "sustained injury either mentally or physically" to A.B. and "she actually was doing quite well" after Hanson attacked her. At his deposition, Santoli said he viewed A.B.'s case as one alleging professional liability, so when MHM gave him a copy of "the Zurich policy," he had reviewed the primary coverage portion of that contract (but not the excess coverage currently at issue) and concluded it did not cover professional liability. Santoli said he would not have looked for any other type of coverage in the contract, because he considered CampMed's policy to be primary and that his company "would in all probability cover the exposure." He had not been retained as MHM's coverage expert, but during this meeting in May 2008, Santoli told MHM that "they needed to send the complaint to Zurich to have them make the [coverage] determination."

¶ 23 In preparation for the strategy meeting on May 22, 2008, MHM CFO Ritchey and MHM CEO Pinkert had reconsidered the Assurance policy and had begun to think that the A.B. suit was alleging covered "administrative failure," rather than noncovered medical malpractice/professional liability.

¶ 24 On June 16, 2008, A.B.'s attorney demanded $7 million to settle the case, and Singer sent an e-mail to Calligaro and McTague, stating "Not a big surprise–same number the judge placed as in the verdict range. I take Plaintiff's deposition tomorrow morning. Settlement conference is on the 26th [of June]. We should make an attempt to offer money before then."

¶ 25 On June 23, 2008, attorney Singer sent an e-mail to MHM general counsel Calligaro and CampMed's claims director McTague responding to her question about stalling the settlement negotiations with A.B. by not producing MHM's financial statements. "Problem is," Singer wrote, "it is clearly in our best interests to get this case settled within the next three or four weeks since we are getting pressured to produce our psychologists for

deposition. I fear their testimonies [might] cause Plaintiff's counsel to be less willing to make meaningful drops in his settlement demand." Singer outlined a strategy for releasing the financial statements. He concluded the e-mail:

"I reiterate that we have to do our darndest to get this case settled before late July since our psychologists Schaab, Fogel and Levinson will be deposed late that month. Once Plaintiff's attorney hears Schaab's and Fogel's testimony–and especially Fogel's detailing his failure to assure Schaab's assessment criteria for eligibility mirrored Fogel's and the other MHM psychologists, Plaintiff's case will be much stronger and leave us with little negotiating power going forward."

MHM CEO Pinkert responded on June 23, 2008, "Our most recent balance sheet will show substantial cash and other liquid assets. The problem (for *** [A.B.]) is that the bank has a perfected interest in those assets (as a result of our loan) *** [which would have priority over any claim by A.B.]." Singer replied on June 23, 2008, "Your company has sufficient cash to 'afford' paying a substantial settlement such as $7 million in cash but can't afford to be hit with a judgment for $7 million without the bank stepping in and enforcing its security interest. Is my interpretation correct? *** Very unusual situation. My goal is to negotiate solely with insurance proceeds." On June 24, 2008, two days before the settlement conference, Pinkert outlined MHM's directions in an e-mail to McTague at CampMed, and attorneys Calligaro and Singer. Pinkert said in part, "There is to be no mention of policy limits (unless the judge specifically asks for them) and we will not release any financials," and that CampMed's Santoli had agreed "we can respond [to the $7 million demand] with something in the $200-$300k range, preferably on the lower end."

¶ 26    On June 26, 2008, the parties convened with the judge for a settlement conference. MHM offered $250,000. Later that day, Singer e-mailed McTague and Calligaro with a summary of the meeting:

"I told the judge and thereafter Plaintiff's counsel that we are not inclined to make an offer in the face of a $6 million demand but would be willing to spend the time in meditation if Plaintiff's counsel gets realistic in his settlement posture.

The judge told me privately that we are taking a significant risk in not making another offer–and a meaningful offer at that which he implied would have to be in the seven figures. I told him that although we respect his willingness to assist the parties toward settlement, we weren't going to entertain a $6 million demand as a new ceiling for negotiation. I also replied that I disagreed with his statement that our $250,000 offer was an insult.

I spoke with Plaintiff's attorney thereafter. They are unwilling to participate in mediation if we are telling them that we are never going to be paying money in the $3 to $4 million range. I told him that I couldn't represent to him that we would ever pay that much. He replied that he didn't want to waste his time in a mediation and additional settlement talks would *** be a complete waste of time."

¶ 27    On June 30, 2008, MHM CFO Ritchey decided to increase MHM's defense accrual to $200,000 and its settlement accrual to $400,000.

¶ 28    In early July 2008, Calligaro was replaced by Deana Simon Johnson, a Georgia lawyer

and partner at the Insley & Race law firm. Johnson had defended MHM against tort claims brought by inmates regarding mental health and dental care services. She asked MHM for every insurance policy in effect when Hanson attacked A.B. and on July 9, 2008, she asked Singer for copies of the pleadings, all relevant motions, and Singer's initial and most recent evaluation of the A.B. action.

¶ 29    Johnson concluded the Assurance policy provided coverage.

¶ 30    On July 9, 2008, Johnson sent Assurance a copy of A.B.'s complaint and sought coverage under both the primary and umbrella/excess components of the Assurance policy. It is undisputed that this was the first notice was given to Assurance.

¶ 31    On July 11, 2008, Assurance claims adjustor Craig R. Carver contacted one of A.B.'s attorneys, Scott Berends, believing, due to misinformation in Assurance's computer system, that Berends was MHM's attorney. After learning counsel's actual role, Carver questioned him about the suit against MHM and disclosed the existence of the Assurance policy.

¶ 32    On July 14, 2008, Carver and Johnson spoke by phone for the first time. Carver testified at his deposition that Johnson raised "the issue of [MHM's] late notice" and "emphatically and enthusiastically" told him she came into the case late, realized that Zurich had not been put on notice, and was "concerned." She did not tell Carver that prior to her involvement in the case, MHM "had denied the existence of this policy." Carver further testified that Johnson verbally acknowledged notice was an issue and he thought there were additional coverage issues.

¶ 33    The next day, on July 15, 2008, Carver e-mailed Singer to ask for information he needed to take a position on coverage. Carver said he had the complaint, was awaiting the written answer from Berends, but needed "a brief summary of discovery, your current evaluation, and a copy of any [motion for summary judgment]" and [w]ith that in hand, I'll will advise Ms. Johnson of our position on coverage." We point out that Carver requested essentially the same documents Johnson requested when she joined the defense team. Singer responded to Carver, "Scott Berends is the Plaintiff's attorney! Why are you talking to him? Please do not do so without authority from Ms. Johnson or me." Singer also e-mailed Johnson, "Am I authorized to perform this? Please advise. Why would this guy be talking to the Plaintiff's attorney before he talks with me? Pretty strange...." Johnson responded, "Absolutely not. I gave him permission to speak with you and Marian [McTague at CampMed]. Unless he is putting his 2 million on the table right now, he has no say in anything." A few minutes later, Singer asked Johnson to clarify, "Do you want me to provide him with the info he asks me to provide him????" Johnson responded immediately, "Pleadings yes. If he wants anything else, refer him to me." On July 16, 2008, Singer sent the requested copy of MHM's summary judgment motion to Carver and advised that Johnson would provide all the other information Carver was seeking. We note, however, that the record does not indicate Johnson had any intention of giving Carver the other information (a summary of the discovery and defense counsel's current evaluation of the case) Carver said he needed in order to make a coverage determination and that Carver was unaware MHM wanted to settle the case and was actively negotiating with A.B.'s attorneys.

¶ 34    On July 21, 2008, Singer e-mailed A.B.'s attorneys with an offer to increase MHM's

settlement offer to $1 million and to schedule a meditation session with a retired judge for August 5, 2008. Johnson used overnight delivery on July 21, 2008, to transmit a copy of the Assurance policy to Singer, unaware that he already had a copy, and advised him to supplement MHM's response to A.B.'s insurance interrogatory.

¶ 35    On July 22, 2008, A.B.'s attorney declined to mediate with a new third party, reasoning that A.B.'s existing demand was fair and less than what MHM would be ordered to pay after a trial, and that having another third party's opinion might only add confusion and that it was best to avoid "get[ting] into a game of continuing to pre-try, mediate, pre-try, and mediate the case until you [MHM] get a third-party to give a number that you like." Counsel concluded, "If we can't agree on what the case is worth, so be it. Just please advise your clients that my current willingness to settle may not be my future willingness to settle."

¶ 36    On July 24, 2008, Singer forwarded the e-mail to Johnson, commenting, "He [A.B.'s attorney] is probing whether we see this case going into the $3 to $4 million range. I suggest we discuss and then I call him late this afternoon."

¶ 37    On July 25, 2008, Johnson e-mailed Pinkert, Wheeler, Ritchey, Calligaro, and Singer with an update after a long conversation that day with A.B.'s attorney. Johnson indicated A.B.'s attorney had mock tried the case multiple times, obtaining verdicts of $7 million, $8 million, and $15 million; he was willing to settle for $3 to $4 million, and he would not participate in mediation unless MHM indicated it was also contemplating that range.

¶ 38    On July 25, 2008, Singer sent by regular mail to A.B.'s attorney some of the declaration pages from the Assurance policy, but not the policy itself.

¶ 39    On July 29, 2008, A.B.'s attorney filed a motion to default MHM for failing to identify the Assurance policy, failing to provide a copy of the policy, and failing to formally update the insurance interrogatory answers.

¶ 40    On July 30, 2008, without informing Assurance, attorney Johnson offered to settle the case for $3 million, and on July 31, 2008, MHM CFO Ritchey increased MHM's settlement reserve for A.B. to $2.25 million. On August 4, 2008, Johnson extended the deadline to 5 o'clock p.m. for A.B. to respond to MHM's $3 million settlement offer. That same day, A.B.'s attorney countered with a $4 million demand, reasoning that, in addition to sexual assault, this case involved attempted murder, A.B. was very young at the time, and she would bear visible injuries for the rest of her life.

¶ 41    At oral arguments on August 5, 2008, A.B.'s counsel pointed out that a records search MHM did in July 2008 in response to Johnson's internal request was what MHM was supposed to have done in April 2008 in response to A.B.'s discovery request. The judge agreed. The judge indicated he intended to sanction MHM but was undecided as to what was appropriate and was not going to give MHM the "death penalty" by entering a default or directed finding.

¶ 42    On August 6, 2008, Johnson wrote to Carver requesting a certified copy of the Assurance policy within 10 days because a certified version was required to resolve the sanctions motion. She also asked Carver to provide Assurance's coverage position within 10 days and stated that Assurance's "delay is complicating attempts to settle this case." This was the first time that MHM advised Assurance that settlement negotiations were taking place. We also

point out that Carver was still waiting for MHM to provide the documents he asked for on July 11, 2008, in order to make a coverage determination. Just one day later, on August 7, 2008, Johnson wrote to A.B.'s attorney proposing several settlement alternatives. She also wrote a letter to Carver dated August 7, 2008, informing him, "the parties have agreed to a settlement value in the amount of $3.5 million if the settlement terms can be finalized within the next 21 days." This was the first time the amount of the settlement was disclosed to Assurance. Johnson proposed that CampMed would pay its full policy of $750,000, Assurance would pay $2 million, and MHM would pay $750,000, in addition to the $150,000 it had already expended from this self-insured retention fund. She also claimed for the first time that the umbrella component, not the primary component, of the Assurance policy applied to A.B.'s suit. Johnson emphasized, "Time is of the essence in the settlement of this claim." She demanded that Assurance respond by August 27, 2008, or MHM would "take all steps necessary to protect itself from exposure on the underlying case." When deposed in the current case, Johnson indicated MHM retained coverage counsel in late July or August 2008.

¶ 43    At some point between July 25, 2008 and early August 2008, Carver and Johnson had a second telephone conversation. Johnson recalls that the conversation was on the July date and Carver recalls it occurring in the early part of August. This time, Carver was calling Johnson in order to explain why he had initially contacted A.B.'s counsel. Carver recalls telling Johnson that he did not believe the Assurance policy would provide coverage for the A.B. suit. Johnson does not recall Carver making that statement, but in a letter dated August 11, 2008, she told A.B.'s attorney that Assurance had orally denied coverage and that, rather than wait "years to see the outcome of the insurance dispute," "it was far simpler for the parties to resolve the case [for $3.25 million, payable within 45 days of the agreement]."

¶ 44    On August 15, 2008, Johnson wrote to A.B.'s attorney to memorialize MHM's agreement to settle the case for $3.5 million. On August 15, 2008, Johnson e-mailed Singer, "MHM has agreed to pay the $3.5 and settle this case" and "I want to inform the Judge of the settlement so that he does not issue an order on the sanctions motion." A couple of hours later, Singer responded, "Glad it is settled. Not likely he would be entering a sanction imminently anyhow."

¶ 45    On August 31, 2008, in light of A.B.'s settlement in principle, MHM CFO Ritchey increased the company's expense accrual to $250,000 and its settlement accrual to $2.5 million, and on September 18, 2008, CampMed increased its indemnity reserve to the $1 million limits of its policy. On September 26, 2008, a written settlement agreement was finalized.

¶ 46    On October 28, 2008, MHM filed its three-count complaint against Assurance, contending that Assurance had wrongfully refused to indemnify MHM for the settlement amount in excess of MHM's primary insurance coverage with CampMed. Assurance counterclaimed that MHM violated the policy's notice provision. After MHM unsuccessfully moved to dismiss the counterclaim, the parties filed cross-motions for summary judgment. Oral arguments were heard on July 6, 2011, and on July 21, 2011, the judge resolved the motions in favor of Assurance. Approximately a year later, the parties appeared before this court for arguments regarding MHM's appeal.

¶ 47		Summary judgment is properly granted when the pleadings, affidavits, and any deposition transcripts on file with the court show that the material facts are undisputed and the moving party is entitled to judgment as a matter of law. *Farmers Automobile Insurance Ass'n v. Burton*, 2012 IL App (4th) 110289, ¶ 14, 967 N.E.2d 329. Summary judgment rulings are reviewed *de novo*, without any deference to the trial judge. *Farmers Automobile Insurance Ass'n*, 2012 IL App (4th) 110289, ¶ 14, 967 N.E.2d 329. In both the trial and appellate courts, the record is construed in the light most favorable to the nonmoving party. *Northbrook Property & Casualty Insurance Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 464, 729 N.E.2d 915, 920 (2000).

¶ 48		MHM's preliminary contention is that the judge erroneously placed the burden on MHM to prove that notice was not unreasonably late. MHM contends this was error because the "plaintiff" bears the burden of proving allegations in its declaratory judgment action (*Board of Trade v. Dow Jones & Co.*, 98 Ill. 2d 109, 116, 456 N.E.2d 84, 87 (1983)) and "Assurance [was] the plaintiff" in its counterclaim alleging MHM violated the notice clause. Assurance responds and we find that the judge employed the correct burden of proof where MHM was the plaintiff in its declaratory judgment action alleging, "41. MHM has fully complied with the terms and conditions of the Assurance policy" and was entitled to indemnification under the policy. Assurance answered, "41. ASSURANCE denies the allegations of Paragraph 41." The rule of law is that a party seeking to enforce a contract has the burden of proving it has substantially complied with all material terms of the agreement. *James v. Lifeline Mobile Medics*, 341 Ill. App. 3d 451, 455, 792 N.E.2d 461, 464 (2003). "A party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him, nor can he recover damages from the other party to the contract." *James*, 341 Ill. App. 3d at 455, 792 N.E.2d at 464. When plaintiff MHM alleged it was in full compliance with its contractual obligations, MHM was claiming that it had fully complied with all of the contract's terms, including the contract's notice clause. The burden of proving this allegation was properly placed on MHM.

¶ 49		We now turn to the heart of this appeal, which concerns the proper interpretation of the policy's notice clause. When construing an insurance policy, we give effect to the intentions of the parties, as expressed by the language of their contract. *West American Insurance Co. v. Yorkville National Bank*, 238 Ill. 2d 177, 184, 939 N.E.2d 288, 293 (2010). With this particular contract, there is no dispute that the scope of the excess insurance coverage encompassed the damages claimed by A.B. What is in dispute is whether MHM complied with the notice requirement when it waited 25 months to inform the insurer it had been sued by A.B. An insured's duties are controlled by the terms and conditions of its insurance contract. *Northbrook*, 313 Ill. App. 3d at 464, 729 N.E.2d at 920. A notice of suit clause in a liability contract is not a mere technical requirement imposed for the convenience of the insurer; the clause imposes valid prerequisites to insurance coverage. *Northbrook*, 313 Ill. App. 3d at 464, 729 N.E.2d at 920; *Yorkville*, 238 Ill. 2d at 185, 939 N.E.2d at 293. Compliance with a notice clause enables the insurer to conduct a timely and thorough investigation into the insured's claim, assess whether settlement or litigation is the best course of action, and participate in the insured's defense. *Northbrook*, 313 Ill. App. 3d at 464-65, 729 N.E.2d at 921; 16 Richard A. Lord, Williston on Contracts § 49:109 (4th ed.

2000). Therefore, an insured's breach of a notice clause by failing to give reasonable notice will relieve the insurer of its duties to defend and indemnify under the policy. *Northbrook*, 313 Ill. App. 3d at 464, 729 N.E.2d at 921; *Yorkville*, 238 Ill. 2d at 185, 939 N.E.2d at 293.

¶ 50    The notice provision at issue is nearly identical to those considered in *Northbrook Amerisure*, and *Yorkville* and stated:

"4.07 Duties [of MHM] in the Event Of Occurrence, Claim or Suit

A) You [MHM] must see to it that we [Assurance] are notified as soon as practicable of an 'occurrence' or an offence which may result in a claim. ***

B) Notice of an 'occurrence' or offense is not notice of a 'claim.' However, if a 'claim' is made or 'suit' is brought against any insured you must:

1) Immediately record the specifics of the 'claim' or 'suit' and the date received;

2) Notify us [Assurance] as soon as practicable; and

3) Provide us [Assurance] with written notice of the 'claim' or 'suit' as soon as practicable.

C) You and any other involved insured must:

1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the 'claim' or 'suit.' "

¶ 51    Under Illinois law, a clause requiring the insured to give its insurer notice of a suit "as soon as practicable" requires notice to be made within a reasonable time in light of the facts and circumstances of the particular case. *Northbrook*, 313 Ill. App. 3d at 465, 729 N.E.2d at 921; *Walsh v. State Farm Mutual Automobile Insurance Co.*, 91 Ill. App. 2d 156, 164, 234 N.E.2d 394, 399 (1968). Thus, the passage of time alone is not sufficient reason to deny coverage. *Northbrook*, 313 Ill. App. 3d at 465, 729 N.E.2d at 921. The insured is expected to act diligently in giving notice. *Northbrook*, 313 Ill. App. 3d at 465, 729 N.E.2d at 921. A court will consider the insured's reason for not providing notice sooner, and if the court concludes the insured's excuse is invalid, the court will find the insured's failure has absolved the insurer of its contractual duties. *Northbrook*, 313 Ill. App. 3d at 465, 729 N.E.2d at 921. In some instances, an insured's belief that coverage was not available under a particular policy has been deemed an acceptable excuse where the insured was acting as a reasonably prudent person when it formed this belief. *Northbrook*, 313 Ill. App. 3d 457, 729 N.E.2d 915 (citing *Farmers Automobile Insurance Ass'n v. Hamilton*, 64 Ill. 2d 138, 142, 355 N.E.2d 1, 4 (1976), *Amerisure Insurance Co. v. Laserage Technology Corp.*, 2 F. Supp. 2d 296, 305 (W.D.N.Y. 1998), and *Ankus v. Government Employees Insurance Co.*, 285 Ill. App. 3d 819, 825, 674 N.E.2d 865, 870 (1996)). The factors a court considers when evaluating whether the insured's excuse is valid may include: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence and reasonable care in ascertaining whether policy coverage is available; and (5) whether the insured's delay caused prejudice to the insurer. *Northbrook*, 313 Ill. App. 3d at 466, 729 N.E.2d at 922; *Yorkville*, 238 Ill. 2d at 185-86, 939 N.E.2d at 293-94.

¶ 52    In *Northbrook*, for instance, primary and excess commercial policies covering "any suit"

alleging "advertising injury" would have encompassed a lawsuit filed against a software developer, Applied, after it advertised a new version of its software that purportedly incorporated more advanced source code it had misappropriated from a competing developer. *Northbrook*, 313 Ill. App. 3d 457, 729 N.E.2d 915. The plaintiff developer, Harbor, alleged copyright infringement, violation of the federal trademark statute, and other competition issues. *Northbrook*, 313 Ill. App. 3d at 460, 729 N.E.2d at 917. Harbor alleged that Applied managed to obtain Harbor's confidential information under the guise of negotiating an exclusive licensing agreement in which the parties' two competing programs would operate together, but once the integration of the two programs was successful, Applied abruptly ended negotiations and said it was no longer interested. *Northbrook*, 313 Ill. App. 3d at 460, 729 N.E.2d at 917. Harbor alleged it discovered the deceit when Harbor's cofounder saw an advertisement in an industry publication announcing Applied's upgraded software. *Northbrook*, 313 Ill. App. 3d at 460, 729 N.E.2d at 918. Applied's general counsel was served with the complaint the day it was filed in federal court in November 1992. *Northbrook*, 313 Ill. App. 3d at 460, 729 N.E.2d at 917. As part of the discovery phase of the suit, in December 1993, Harbor asked Applied to produce its marketing materials for the offending product. *Northbrook*, 313 Ill. App. 3d at 462, 729 N.E.2d at 919.

¶ 53     Seventeen months after being served with process in late 1992 and four months after receiving the document request in late 1993, Applied gave notice to its insurer, along with its general counsel's explanation that he had only recently determined that Harbor's complaint sought damages for an " 'advertising injury.' " *Northbrook*, 313 Ill. App. 3d at 462, 729 N.E.2d at 919. According to counsel, he assumed coverage was unavailable because the claims seemed to be about intentional tortious conduct, which he believed was subject to a policy exclusion. *Northbrook*, 313 Ill. App. 3d at 462, 729 N.E.2d at 919. "[Counsel] did not base his assumption on any particular provision in the [insurance contract], but rather on his understanding from studies in law school." *Northbrook*, 313 Ill. App. 3d at 462, 729 N.E.2d at 919. Furthermore, counsel did not compare Harbor's complaint with the policy, because he considered the insurance contract to be " 'beyond our comprehension.' " *Northbrook*, 313 Ill. App. 3d at 462, 729 N.E.2d at 919. Shortly after receiving the discovery request for Applied's marketing materials, however, the lawyer read an explanation of advertising injury coverage, and shortly after that, gave notice. *Northbrook*, 313 Ill. App. 3d at 463, 729 N.E.2d at 919.

¶ 54     Applying the factors for evaluating an insured's excuse for not adhering to a notice clause, the court first determined that the notice clause was controlling and that a software development company with inside and outside counsel is a sophisticated insured. *Northbrook*, 313 Ill. App. 3d at 467, 729 N.E.2d at 923. The court also determined that the general counsel's failure to appreciate the scope of coverage under the policy was no excuse for late notice.

> "By failing to review the policies and the complaint together to determine whether advertising injury coverage was implicated, Applied, and specifically [its] general counsel, failed to act like a reasonably prudent insured under the circumstances. A reasonable insured's attorney would have examined the complaint and relevant policy provisions to gauge the applicability of coverage rather than 'assuming,' as [counsel] did,

-16-

that coverage was excluded. A reasonable insured additionally would not have simply concluded that the advertising injury coverage was uncomprehensible. If [counsel] did indeed find the policies too complicated to understand, he could have easily conferred with someone knowledgeable in the subject within a reasonable time period to determine if notice and a tender of defense should have been given to [the insurance company]." *Northbrook*, 313 Ill. App. 3d at 467-68, 729 N.E.2d at 923.

¶ 55    An identical notice provision requiring notice "as soon as practicable" of any suit was in the primary and excess policies at issue in *Amerisure*. *Amerisure*, 2 F. Supp. 2d at 299. In that case, the insureds were sophisticated in commerce and insurance matters (*Amerisure*, 2 F. Supp. 2d at 305), but failed to read their policies (*Amerisure*, 2 F. Supp. at 300). After being served with process in August 1995, the insureds immediately contacted their attorney, who was a partner in a 70-attorney law firm which listed insurance law as one of its areas of practice. *Amerisure*, 2 F. Supp. 2d at 299. The attorney summarily dismissed his clients' question of whether there was insurance coverage, stating, "No, of course not. It is patent litigation." (Internal quotation marks omitted.) *Amerisure*, 2 F. Supp. 2d at 300. However, the policies' definition of a covered advertising injury encompassed the allegations that the insureds were telling customers that a competitor was using stolen technology. *Amerisure*, 2 F. Supp 2d at 304. Seven months later, a different partner at the firm read the insurance policies and the complaint and concluded that the insureds should give notice of the action to their insurers, and a month after that, the insureds finally gave notice. *Amerisure*, 2 F. Supp. 2d at 300-01. In the court's opinion, these insureds "clearly failed to exercise due diligence in ascertaining whether coverage was available, as evidenced by the fact that they did not even review their policies." *Amerisure*, 2 F. Supp. 2d at 305. In addition, the court found that the eight-month delay in providing notice prejudiced their primary and excess insurers "since it deprived them of the opportunity to meaningfully participate in the underlying *** litigation." *Amerisure*, 2 F. Supp. 2d at 305.

¶ 56    With these cases in mind, we consider MHM's adherence to the "as soon as practicable" notice clause in its excess insurance contract with Assurance. With regard to the first factor, MHM contends the language of paragraph 4.07 is "neutral" as to when MHM was required to give notice to Assurance, but that paragraph 1.02 gave MHM discretion over the timing of its notice and that an insurance contract, like all contracts, is construed as a whole in order to give full effect to the parties' intentions at the time of contracting. *Yorkville*, 238 Ill. 2d at 184, 939 N.E.2d at 293. The paragraph MHM contends gives discretion states:

"1.02 Defense, Settlement and Supplementary Payments

    A) When 'underlying insurance' does not apply to an 'occurrence' or offense and coverage for the 'occurrence' or offense is provided by the coverage part, we [Assurance] have the right and duty to defend any 'suit' seeking damages[.] ***

    B) When 'underlying insurance' does apply to an 'occurrence' or offense, we are not obligated to investigate, defend or be responsible for payment of supplementary expenses provided by the 'underlying insurance.' However, we have the right and opportunity to associate with you and your underlying insurer in the defense and control of any 'claim' or 'suit' reasonably likely to involve us. Should this occur, you are obligated to cooperate

-17-

fully with us.

When the limits of insurance, afforded to you by your 'underlying insurance,' are used up by an 'occurrence' or offense, we will assume charge of the settlement or defense or any 'claim' or 'suit' against you resulting from the same occurrence. Our coverage part must cover the 'occurrence' or 'suit' and be the immediate excess coverage of your 'underlying insurance.' When we associate with you or assume charge of the defense of any 'claim' or 'suit' we will do so at our own expense. The amount we pay for defense is in addition to the applicable LIMITS OF INSURANCE stated on the DECLARATIONS PAGE. Our right and duty to defend end when we have used up the applicable limits of insurance in the payment of judgments and settlements.

C) Supplementary Payments."

¶ 57    MHM contends paragraph 1.02 was authorization to notify Assurance whenever MHM determined a claim was "reasonably likely" to implicate its excess coverage. MHM further contends it was reasonable to give Assurance notice only after motion practice made it apparent MHM would not prevail against A.B.'s suit and that MHM did not have adequate primary insurance to satisfy the likely amount of a judgment or settlement. Continuing, MHM argues the judge did not properly construe the policy language and the law regarding the reasonableness of an excuse for delayed notice.

¶ 58    Assurance responds that some excess policies expressly give the insured discretion as to when to furnish notice, but this is not one of those policies, as the judge correctly concluded. Furthermore, MHM misunderstands or has misstated the authority which it relies upon–authority which the judge fully understood and properly applied.

¶ 59    We reject MHM's attempt to blend the defense and settlement terms of paragraph 1.02 into the notice clause set out in paragraph 4.07. Paragraph 1.02 does not concern MHM's duty to give notice. Paragraph 1.02 spells out Assurance's right to participate in the defense of a claim, if Assurance chooses to participate, but indicates that when this right is triggered, Assurance is not obligated to act upon it. This right-but-not-obligation of Assurance can occur only after MHM has given notice "as soon as practicable" in accordance with paragraph 4.07. MHM's reporting obligation under paragraph 4.07 is not affected by Assurance's subsequent right to participate in MHM's defense under paragraph 1.02. In fact, an insured's failure to comply with its duty under paragraph 4.07 until it had already lost several rounds of motion practice would defeat the insurer's right under paragraph 1.02 to participate in the defense. In this case, by the time MHM finally gave notice to Assurance, the question of whether Assurance could effectively defend against A.B.'s claims had been firmly answered in the negative. The principle MHM relies upon that a policy must be construed as whole, so that every provision is given effect (*Yorkville*, 238 Ill. 2d at 184, 939 N.E.2d at 29; *American Standard Insurance Co. of Wisconsin v. Slifer*, 395 Ill. App. 3d 1056, 1060, 919 N.E.2d 372, 376 (2009)) does not mean that unrelated provisions concerning the two different parties should be cobbled together to create terms that neither party intended at the time of contracting. MHM's proposed interpretation would render the notice clause a nullity. Our role is to assume that every contract provision was intended to serve a purpose and to apply the parties' agreement as it was written. *American Standard*, 395 Ill. App. 3d

at 1060, 919 N.E.2d at 377. We may not, under the guise of construction, rewrite the notice clause to suit MHM. *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.*, 132 Ill. App. 3d 325, 329, 477 N.E.2d 30, 33 (1985); *Walsh*, 91 Ill. App. 2d at 164, 234 N.E.2d at 399.

¶ 60      We find that MHM was not contractually entitled to exercise discretion as to whether to give notice. Pursuant to paragraph 4.07, MHM was contractually required to give Assurance notice of *every* claim or suit "as soon as practicable" regardless of the amount of potential liability or whether MHM had reason to believe the Assurance excess policy might be implicated. The notice terms in the Assurance excess policy starkly contrast with excess policies which actually give the insured discretion as to when to notify the insurer. For instance, the notice provision in *Atlanta International Insurance Co. v. Checker Taxi Co.*, 214 Ill. App. 3d 440, 443, 574 N.E.2d 22, 24 (1991), stated: " 'Whenever the Insured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which, in the event that the Insured shall be held liable, *is likely to involve this policy*, notice shall be sent to the Company as soon as practicable ***.' " (Emphasis added.) Policy terms such as this led one court to summarize:

> "[G]enerally [excess policies] do not require immediate notice of an occurrence as do provisions in primary policies. [Citation.] Excess insurers are not interested in every accident, but only in those that may be serious enough to involve [them]. [Citation.] Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification of occurrences until the excess policy is reasonably likely to be implicated. [Citation.] Consequently, insurance policies for excess coverage generally grant the insured some discretion in evaluating the case." (Internal quotation marks omitted.) *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 311, 631 N.E.2d 1292, 1301 (1994).

Discretionary terms appeared in several policies at issue in *Tribune Co. v. Allstates Insurance Co.*, 306 Ill. App. 3d 779, 791, 715 N.E.2d 263, 272 (1999), where the court stated: "Some of the excess insurers *** require notice only when a claim or occurrence 'appears likely to involve' the excess policy, or the occurrence is 'likely to give rise to a claim' within the excess coverage. *** The policies give the insured considerable discretion for deciding whether a claim appears reasonably likely to result in liability within the coverage." However, one excess policy in that case had "a markedly different notice requirement." *Tribune Co.*, 306 Ill. App. 3d at 791, 715 N.E.2d at 272. That exception, issued by Executive Re Indemnity, provided coverage for losses in excess of $50,000, up to a limit of $1 million, and required immediate notice of any " 'occurrence which, in the Insured's or underlying insurer's estimate of the injuries or damages sought, WITHOUT REGARD TO LIABILITY, might result in a judgement in an amount sufficient to involve [the insurance].' " *Tribune Co.*, 306 Ill. App. 3d at 789, 715 N.E.2d at 271. The court construed these terms to mean "plaintiffs needed to notify the insurer of any occurrence in which the injured party's total damages appeared likely to exceed $250,000, even if the insured believed it could not be held liable for those damages." *Tribune Co.*, 306 Ill. App. 3d at 789, 715 N.E.2d at 271. Although the Assurance policy at issue was an excess policy, its notice clause did not grant MHM any discretion.

¶ 61      We are not swayed by the case MHM relies upon, *Zurich Insurance Co. v. Walsh*

*Construction Co. of Illinois, Inc.*, 352 Ill. App. 3d 504, 509, 816 N.E.2d 801, 806 (2004), in which the insured was subject to an " 'as soon as practicable' " notice clause, made no attempt to notify its excess carrier until its primary carrier became financially insolvent, yet was deemed in compliance with the policy. It appears the court replaced the specific policy language under consideration with the court's statement in *Tribune Co.* (which we quoted above) that excess policies generally do not require notice until it appears " 'likely' " the excess coverage will be implicated. *Walsh Construction*, 352 Ill. App. 3d at 509-10, 816 N.E.2d at 806 (quoting *Tribune Co.*, 306 Ill. App. 3d at 790, 715 N.E.2d at 272). We adhere to the actual language of the notice clause at issue. We also note that the other factors weighed in the insured's favor. *Walsh Construction*, 352 Ill. App. 3d at 511, 816 N.E.2d at 808. Thus, *Walsh Construction* is not on point.

¶ 62     We also reject MHM's suggestion that *Yorkville* required the judge and now this appellate court to disregard the first factor because the Assurance policy language does not specify an exact number of days or other time frame for giving notice. See *Yorkville*, 238 Ill. 2d at 186, 939 N.E.2d at 294 ("Under the first *** factor, the specific language in the Policy's notice provision does not aid in our reasonableness analysis because it does not identify a specific time frame for giving notice."). Although the *Yorkville* court did not find this factor particularly helpful in its analysis, the court did not invalidate this factor altogether and it adhered to the principle that each case is to be decided on its particular facts and circumstances. *Yorkville*, 238 Ill. 2d at 185, 939 N.E.2d at 293 ("Whether notice has been given within a reasonable time depends on the facts and circumstances of each case."). The facts and circumstances in *Yorkville* are readily distinguishable from what occurred here and indicate that the specific date of the client's *written* notice deserved little attention. The insured in *Yorkville*, a bank, gave oral notice of a defamation suit on numerous occasions before eventually giving written notice. *Yorkville*, 238 Ill. 2d at 190, 939 N.E.2d at 296. More specifically, within a few months of being served with the defamation suit in late 2001, the bank's president met with a West American insurance agent and told him the bank was " 'involved in a defamation lawsuit in Ottawa' " which was a " 'he said/she said sort of thing,' " and that the bank's director and officer policy was not covering the claim. *Yorkville*, 238 Ill. 2d at 181-82, 939 N.E.2d at 291. The bank president asked the West American agent whether the commercial general liability and umbrella policies the agent had placed with the bank would cover the suit. *Yorkville*, 238 Ill. 2d at 182, 939 N.E.2d at 291. Without comparing the allegations of the complaint with the actual policy language, the agent simply replied, " 'Probably not. Most all of those policies are written the same anyway.' " *Yorkville*, 238 Ill. 2d at 182, 939 N.E.2d at 291. During this same time frame, the bank president met with another West American agent, who gave the bank president " 'basically the same response' " as the first agent, stating that the commercial policies probably would not cover the defamation suit. *Yorkville*, 238 Ill. 2d at 182, 939 N.E.2d at 292. Meeting minutes indicated the defamation suit was discussed at three different meetings of the bank's board of directors. *Yorkville*, 238 Ill. 2d at 182, 939 N.E.2d at 292. The first insurance agent was a member of this board. *Yorkville*, 238 Ill. 2d at 182, 939 N.E.2d at 292. In 2004, the bank was advised by an unrelated insurance company that the West American policy probably did cover the defamation suit, which prompted the bank to give written notice later that same

month. *Yorkville*, 238 Ill. 2d at 182-83, 939 N.E.2d at 292. This was 27 months after the suit was filed. However, after considering the relevant factors, the court determined that the initial " 'passing' " conversation between the bank president and first insurance agent, as well as the discussion at the board meetings, conveyed sufficient information to trigger the insurer's duty to defend under the policy. *Yorkville*, 238 Ill. 2d at 190, 939 N.E.2d at 296. "At the very least, the agent could have followed up with [the bank] *** by requesting to see a copy of the complaint before advising it that the lawsuit probably was not covered." *Yorkville*, 238 Ill. 2d at 190, 939 N.E.2d at 296. Thus, *Yorkville* joins *Northbrook* and *Amerisure* as cases indicating that a reasonable person considers the complaint's allegations as well as the policy's language to determine whether coverage is available. The opinion does not support MHM's contention that the specific language of this policy's notice clause should be disregarded.

¶ 63   Accordingly, we conclude the first factor weighs against MHM.

¶ 64   As for MHM's sophistication in commerce and insurance, MHM was savvy enough to have both primary and excess/umbrella coverage, it retained a part-time and later a full-time general counsel (Calligaro and then Johnson), it had the benefit of local litigation counsel (Singer), in 2008 it retained coverage counsel, and it had cash on hand to pay its litigation expenses and its share of settlement to A.B. We do not consider this factor particularly helpful, but it weighs in favor of us finding that MHM's delay in giving notice was unreasonable.

¶ 65   The third factor favors neither party because there is no indication MHM was aware of the underlying tort before A.B. sued MHM.

¶ 66   The fourth factor unquestionably weighs against MHM. The record indicates MHM initially looked at the Assurance policy for primary coverage, determined primary coverage was subject to a policy exclusion for professional liability, and looked no further in the policy. The fact that MHM has abandoned its reliance on that primary coverage exclusion is an indication that MHM did not exercise reasonable "diligence in ascertaining whether policy coverage *** [was] available." *Yorkville*, 238 Ill. 2d at 187, 939 N.E.2d at 294. MHM did not consider the possibility of Assurance excess coverage until July 2008, which it attributes to its supposed belief that A.B.'s suit was defensible within the limits of its CampMed policy. This is not a credible position.

¶ 67   The record shows that as early as June 14, 2006, when MHM was served by A.B., the company's general counsel (Calligaro), recognized that the case was an "outlier" and exception to the numerous typical claims MHM faced due to its work in the IDOC prison system. The typical case against MHM was a $10,000, "frivolous" prisoner's suit regarding the adequacy of mental health care MHM provided, and all of these prisoner cases were dismissed or settled well within the self-insured retention of MHM's primary professional liability insurance with CampMed. A.B.'s case, however, was not a *pro se* prisoner's claim, nor did it involve the provision of mental health care. In startling, horrendous detail, this complaint indicated MHM's negligent screening allowed a recidivist, sadistic predator to sexually assault and attempt to murder a teenage girl. Additionally, it is beyond dispute this complaint indicated the plaintiff bore emotional and physical scars due to the brutal sexual

-21-

assault and attempted murder. This claimant sought damages in excess of $50,000. These facts alone are sufficient to indicate MHM should have given notice to Assurance as early as mid-2006.

¶ 68    Furthermore, there were numerous developments in the case during 2006, 2007, and 2008 which would have prompted a reasonable person to give notice to its excess insurance carrier. By July 18, 2006, Calligaro had received the e-mails from Dr. Fogel, the director of IDOC's mental health services sex offender evaluation unit, in which Dr. Fogel enumerated the "[p]roblems that occurred in this case," including the "chaotic" environment at MHM when Hanson's incomplete file was reviewed and rejected for civil commitment proceedings, the filing system which deliberately separated the record of Hanson's sex offenses from the record of his aggravated battery, and the fact that the psychologist who probably looked at the file had used unique criteria for determining eligibility for commitment. In addition, by November 26, 2006, MHM had lost its motion for dismissal on grounds of sovereign immunity.

¶ 69    By September 30, 2007, MHM had already expended $36,000 in defense costs–far more than its typical $10,000 suit–and, based on an estimate that it would incur an additional $50,000 to $100,000 in defense costs, it increased its defense expense accrual by $75,000. By October 16, 2007, Calligaro and the MHM management team were discussing the need to settle the case while MHM's motion for summary judgment was still pending, because Hanson's attack of A.B. was "so horrible that a jury will want to hold someone responsible," "we are the only solvent party involved," and "if we lose this motion, we have no other motions to avoid a trial."

¶ 70    By March 11, 2008, MHM lost its summary judgment argument and had been advised by the judge, in the presence of A.B.'s counsel, that MHM would most certainly lose a jury trial and should immediately hire a mediator and settle the case for at least $5 million. By MHM's own account, up until this juncture, it believed the case was insignificant enough to be resolved within the $1 million limits of the CampMed primary policy, but its perception of the case was suddenly and dramatically changed by the judge's decision and remarks. Even so, it did not give Assurance notice. Furthermore, in April 2008, MHM was required to search its files in order to accurately answer A.B.'s interrogatory regarding insurance coverage, but MHM still failed to give notice to Assurance, and later that month, on the 24th, attorney Singer sent his client a disturbing and detailed assessment of the case. Singer "*strongly recommend[ed] that we provide all insurance information Plaintiff's counsel is seeking*–even insurance policies totally unrelated to the time period in controversy," but MHM did not heed its counsel's recommendation. (Emphasis in original.) Singer also offered his opinion that it was "*over 85%*" probable that a jury would return "a multi-million dollar judgment" against MHM, "this is a very dangerous case for the company," and the only reasonable alternative would be to negotiate a settlement. (Emphasis in original.) Despite Singer's emphatic conclusion on April 24, 2008, that MHM was undoubtedly facing a multimillion dollar judgment or settlement, MHM increased its defense accrual to only $175,000 and for the first time accrued $100,000 toward settlement, and did not give notice to Assurance.

¶ 71    MHM attributes its failure to the fact that as late as May 22, 2008, CampMed

president/CEO Santoli believed there "a reasonable probability" MHM would escape from liability altogether or perhaps A.B. would settle for or be awarded as little as $1 million. In our opinion, a reasonable person would have given notice upon being served in 2006, before Santoli reached this conclusion in 2008. Furthermore, when faced with the conflicting beliefs of the Illinois defense attorney in April and the out-of-state insurer in May about the likely outcome of this Illinois lawsuit, a reasonable person would have erred on the side of giving notice to Assurance, no later than "as soon as practicable" after Santoli made his prediction. There is also the fact that Santoli recalls telling MHM during the strategy meeting on May 22, 2008, that MHM "needed to send the complaint to Zurich to have them make the [coverage] determination." Nonetheless, MHM did not heed his urging.

¶ 72    By the end of June 2008, MHM was anxious to settle the case before A.B. could depose the psychologists and learn that Hanson's evaluation had been performed in a "chaotic" office, using an improper criterion and an incomplete record of Hanson's crimes; discovery was winding down in anticipation of trial later that year; the judge said MHM's $250,000 settlement offer was "insulting" to A.B. and that MHM needed to come up with at least "seven figures"; and A.B.'s attorney refused to "waste" any more time in settlement talks with MHM unless it raised negotiations to at least $3 million. By June 30, 2008, MHM increased its settlement accrual to $400,000, which was an acknowledgment that the settlement or judgment in this disturbing case would exceed the $1 million limits of MHM's primary policy with CampMed. Nonetheless, MHM did not contact its excess insurer.

¶ 73    MHM did not give notice until Johnson joined the defense team in July 2008, asked for and read all the insurance policies, and tendered/gave notice to Assurance on July 9, 2008. The fact that MHM gave notice *months* after it was obvious it could not prevail in the suit reveals that MHM's delay in giving notice had nothing to do with its belief about the defensibility of A.B.'s suit. Rather, this timing reveals that this insured did not bother to read the complaint and its insurance contract together. The record shows that MHM did not act with diligence and reasonable care to determine whether policy coverage was available. This is yet another factor weighing against MHM's contention that it had a legitimate excuse for not giving notice earlier than it did.

¶ 74    We have also disregarded MHM's suggestion that its subjective belief that it could prevail in the case, up until the judge's rejection of the summary judgment motion, is dispositive. "Reasonableness is an objective standard and can be determined as a matter of law where, as here, the facts are not in dispute." *Walsh Construction*, 352 Ill. App. 3d at 509, 816 N.E.2d at 806.

¶ 75    Our assessment of the fourth factor is bolstered by *Amerisure*, 2 F. Supp. 2d 296, the case we referred to above indicating the insured formed the erroneous belief it was not covered for allegations it slandered a competitor as a technology thief. The *Amerisure* record showed that the insured had not reviewed their policies, just as the record shows here that despite losing a motion to dismiss a counterclaim, losing cross-motions for summary judgment, and being asked to produce each and every insurance policy in effect since 2000, MHM did not look past the professional liability exclusion governing the primary portion of the Assurance policy and review the terms of its excess coverage.

¶ 76    The fifth and final factor also weighs against MHM, because by the time Assurance was given notice, its right to participate in the defense was prejudiced. By the time Assurance was notified on July 9, 2008, the only unanswered question was the specific dollar amount A.B. would receive from MHM for her injuries. By the time notice was given on July 9, 2008: (1) MHM had exhausted its arguments through motion practice and was facing a late 2008 trial date; (2) MHM's litigation counsel (Singer) had advised that a trial and postjudgment appeal was foolhardy; (3) the judge and MHM's litigation counsel (Singer) had advised that, without question, a jury would give A.B. a substantial, multimillion dollar judgment; (4) discovery was nearly complete and MHM's litigation counsel was adamant that A.B. would realize the real strength of her case if she were able to depose MHM's psychologists (Schaab and Foley), who were scheduled for depositions in June or July (the record does not disclose specific deposition dates); and, (5) finally, MHM was actively negotiating a settlement with A.B. These are indications that Assurance was deprived of any meaningful participation in the defense until the case was in the last possible stage.

¶ 77    Furthermore, the record shows that once MHM gave notice, it rebuffed Assurance's participation in its defense of A.B.'s suit. On June 30, 2008, MHM increased its settlement accrual to reflect a settlement in excess of the CampMed $1 million policy limits; on July 9, 2008, Assurance claims adjustor Carver received notice from Johnson and a copy of A.B.'s pleading; on July 11, 2008, Carver mistakenly requested MHM's answer from A.B.'s attorney; and on July 15, 2008, Carver asked Singer for MHM's summary judgment motion, Singer's summary of discovery, and Singer's current evaluation of the case, so that Assurance could make a coverage determination. MHM, however, deliberately ignored Carver's request. That same day, July 15, 2008, when Singer asked Johnson whether he was authorized to provide the requested information to Carver, Johnson replied, "Absolutely not. *** Unless he is putting his 2 million on the table right now, he has no say in anything." When Singer e-mailed again within a few minutes to clarify Johnson's response, Johnson told Singer to give Carver the pleadings and refer Carver to her for "anything else." In his subsequent cover letter to Carver, Singer said Johnson would be providing all the other information Carver was seeking, when in fact, Johnson had no apparent intention of sharing it. As we noted above, the information Carver requested was essentially the same information Johnson wanted when she joined the defense team. Furthermore, MHM did not inform Assurance until August 6, 2008, that settlement negotiations were underway. This occurred when Johnson wrote to Carver to request a certified copy of the policy. She asked Carver for Assurance's coverage position and complained that Assurance's "delay is complicating attempts to settle this case." Just one day later, on August 7, 2008, Johnson disclosed in a letter to Carver that the parties had tentatively agreed to a $3.5 million settlement and she proposed that Assurance contribute $2 million to that amount. MHM now disingenuously argues that it was abandoned by Assurance, when the record reveals that MHM was uninterested in Assurance's participation in MHM's defense. MHM also unpersuasively contends it settled the case when it did only because it was facing the discovery sanctions ruling. The record indicates MHM was anxious to settle before A.B. deposed MHM's doctors and realized the true strength of her case.

¶ 78    This record leads us to conclude the fifth and final factor is an additional factor weighing

against MHM.

¶ 79    Thus, none of the relevant facts and circumstances favor MHM. Accordingly, we reject MHM's contention that the timing of its notice was reasonable. We find that MHM's late notice was inexcusable and that its breach of the notice clause defeats any right to recover under the policy. *Northbrook*, 313 Ill. App. 3d at 464, 729 N.E.2d at 921; *Yorkville*, 238 Ill. 2d at 185, 939 N.E.2d at 293.

¶ 80    MHM also contends that Assurance handled this claim in bad faith and, therefore, is liable to MHM pursuant to Virginia law for damages, attorney fees, and costs. MHM cites to Virginia law because its principal place of business is in Virginia and the excess policy was delivered to its Virginia location. The trial judge determined she did not need to reach this issue because MHM's late notice relieved Assurance of any liability or duty to defend under the excess policy. See *Northbrook*, 313 Ill. App. 3d at 464, 729 N.E.2d at 921; *Yorkville*, 238 Ill. 2d at 185, 939 N.E.2d at 293 (an insured's breach of a notice provision by failing to give reasonable notice will defeat the right of the insured to recover under the policy). We have reached the same conclusion as the trial judge, but we choose to address this relatively simple argument.

¶ 81    The Virginia law that MHM relies upon states in pertinent part:

"Whenever any insurer on a policy of liability insurance discovers a breach of the terms or conditions of the insurance contract by the insured, the insurer shall notify the claimant or the claimant's counsel of the breach. Notification shall be given within forty-five days after discovery by the insurer of the breach or of the claim, whichever is later. *** Failure to give the notice within forty-five days will result in a waiver of the defense based on such breach to the extent of the claim by operation of law." Va. Code Ann. § 38.2-2226 (West 2008).

¶ 82    This law has no bearing here. One reason it is irrelevant is that it is a procedural law and another state's procedural laws are not controlling in this case. *Federal Insurance Co. v. Nationwide Mutual Insurance Co.*, 448 F. Supp. 723, 725 (W.D. Va. 1978) (holding that section 38.1-389.1 (Va. Code Ann. § 38.1-389.1 (West 1978)) is "clearly procedural"); *Morrel v. Nationwide Mutual Fire Insurance Co.*, 188 F.3d 218, 226 (W.D. Va. 1999) (indicating section 38.1-389.1, which imposed a 20-day deadline, was the predecessor of the current statute, section 38.2-2226, which imposes a 45-day deadline); *Marchlik v. Coronet Insurance Co.*, 40 Ill. 2d 327, 239 N.E.2d 799, 801 (1968) (indicating that if a law is procedural, the law of the jurisdiction in which relief is sought will instead be governing). Another reason the Virginia statute is irrelevant is because it cannot be applied to the parties before us–it cannot be used by an insured in a dispute with its insurance carrier. In fact, even if MHM had sued Assurance in Virginia and could rely on that jurisdiction's procedural laws, it could not rely on section 38.2-2226. Section 38.2-2226 is a public policy statute which, as explained by the Supreme Court of Virginia, was intended to protect claimants such as A.B.:

"The obvious purpose of the statute is to require a liability insurer that intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant *** so that

steps may be taken by the claimant, *a stranger to the insurance contract*, to protect his rights." (Emphasis added.) *Liberty Mutual Insurance Co. v. Safeco Insurance Co. of America*, 288 S.E.2d 469, 474 (Va. 1982).

Another Virginia court expressed similar thoughts:

"[W]hen a third party has been injured in an accident in Virginia, public policy in Virginia demands that potential claimants be notified when liability insurers intend to deny coverage to their insureds. If an insurer can require the insured give prompt notice of any accident, it is certainly reasonable that a state can, as a part of its public policy, require the insurer to give notice of a policy defense to the injured claimant, particularly to a third party injured by the insured.

\* \* \*

\*\*\* The statute was intended to cover situations identical to the present case [in which a Virginia resident was struck and injured on a Virginia road by a Tennessee driver and there was a three month lag before the insurer informed the injured man of the insurer's defense to coverage]. The insurer can prevent, without difficulty, a claimant's wasting of finances and time pursuing a judgment that later proves to be uncollectible. Virginia, through this statute, has manifested a legitimate interest in safeguarding the rights of persons injured within her boundaries." *Federal Insurance Co.*, 448 F. Supp. at 725.

¶ 83     MHM relies on *State Auto Property & Casualty Insurance Co. v. Gorsuch*, 323 F. Supp. 2d 746 (W.D. Va. 2004), for the proposition that an insured can use the statute to invalidate the late-notice defense. But in *Gorsuch*, the statute was triggered by the insurer's failure to notify the claimants in the underlying tort suit within 45 days and the court repeated the well-established principle that the statute's purpose is "to allow the claimant, an outsider to the insurance contract, to take any necessary steps to protect her rights." *Gorsuch*, 323 F. Supp. 2d at 756. Ultimately, *Gorsuch* is no different than any other case in which the Virginia statute was employed by the underlying claimant.

¶ 84     For these reasons, we reject MHM's contention that it may invoke the Virginia statute to salvage its right to coverage under the Assurance policy.

¶ 85     Finally, MHM contends Assurance waived its late-notice defense because the insurer did not issue a reservation-of-rights or declination letter on this basis between July 2008 when notice was given and August 2008, when MHM settled A.B.'s case. MHM contends that by requesting copies of the A.B. pleadings, Assurance created the impression it was investigating the claim and had no intention of asserting the late-notice defense. MHM points to indications in Assurance's internal records that it could deny the claim based on the contract's professional liability exclusion, and that there is no similar notation regarding denial due to late notice. In fact, Assurance first raised the late-notice issue in its counterclaim here. MHM contends Assurance's conduct amounts to waiver of the late-notice defense, but the judge employed the wrong legal standard by expecting MHM to show detrimental reliance.

¶ 86     Assurance responds that it was investigating the claim adversely to MHM, that it was entitled to conduct a reasonable investigation into a newly tendered claim without waiving

the notice defense, that as an excess insurer it had no obligation to issue a reservation-of-rights letter, and that even if it was considering the professional liability exclusion, it could raise other defenses in this coverage case.

¶ 87 We reject this appellant's final contention because (1) it has failed to point to any facts or contract terms entitling it to a position letter within the two months between its notice to Assurance and its decision to settle A.B.'s case without Assurance, and (2) Assurance had no obligation to issue a reservation of rights letter. *Montgomery Ward & Co. v. Home Insurance Co.*, 324 Ill. App. 3d 441, 451, 753 N.E.2d 999, 1007 (2001) (an excess insurer that only has a duty to indemnify has no obligation to issue a reservation-of-rights letter).

¶ 88 Affirmed; motion taken with the case denied.